**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 12 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DEWAYNE BROOKS,

Defendant-Appellant.

No. 97-1367

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 96-CR-303-AJ)

---

Darold W. Killmer, Denver, Colorado, for Appellant.

Stacey Ross, Assistant U. S. Attorney, Denver, Colorado, (Henry L. Solano, United States Attorney, with her on the brief), for Appellee.

---

Before**, TACHA, HENRY,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

# I.  INTRODUCTION

Dewayne Brooks was charged in a one-count indictment with distribution of "cocaine base" in violation of 21 U.S.C. § 841.  After a two-day trial, the jury found Brooks guilty as charged.  The district court denied Brooks' oral motion for judgment of acquittal and sentenced Brooks to a 165-month term of imprisonment.  On appeal, Brooks asserts the district court committed four trial errors and two sentencing errors.  As to the trial, Brooks asserts the district court: (1) abused its discretion in admitting into evidence a tape recorded conversation referring to uncharged drug transactions; (2) abused its discretion in failing to declare a mistrial after a government witness testified about an uncharged drug sale subsequent to the charged transaction; (3) erred in failing to excuse a juror for cause who exhibited implied bias based on occupation; and (4) erred in failing to question a juror about potential misconduct after the juror was observed talking to a uniformed court security officer during a lunch break.  As to sentencing, Brooks asserts the district court committed plain error in: (1) failing to hold unconstitutional the Sentencing Guideline distinction between crack and powder cocaine; and (2) calculating his base offense level premised on distribution of "crack" without any evidence the cocaine base contained sodium bicarbonate.  This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms**.

## II. BACKGROUND

The facts, stated briefly and in the light most favorable to the United States, are as follows. This case arises out of a drug transaction which took place on September 15, 1995. On that date, cooperating witness Maurice Johnson, acting at the direction of FBI Agent Tommy Ross and Denver Police Detective Norman Pressley, made two telephone calls to an individual identified as "Paper" for the purpose of setting up a drug purchase. Paper agreed to sell Johnson four ounces of cocaine for $950 an ounce. Paper and Johnson agreed to meet at a Safeway parking lot to complete the transaction. Following this telephone conversation, Johnson and Pressley drove to the Safeway parking lot to complete the transaction. Johnson made a second call to Paper from the Safeway parking lot; Paper instructed Johnson to drive across the street to an apartment complex. Once Johnson and Pressley reached the apartment complex, Brooks approached the car and entered the back seat. Brooks handed Pressley two baggies containing a total of approximately four ounces of crack cocaine and accepted $3800 in return.

Brooks was eventually arrested in 1997 and indicted for distribution of cocaine base based on the September 15th transaction. At trial, the United States relied primarily on the testimony of Ross and Pressley to prove the allegations against Brooks. FBI Agent Ross testified that he observed the drug transaction

from a distance of approximately thirty yards. Ross testified that he had monitored the first telephone call between Johnson and Paper and had observed Johnson and Pressley drive to a Safeway grocery at Paper's direction. Ross also monitored the second call between Johnson and Paper in the Safeway parking lot and observed Johnson and Pressley as they drove across the street to the apartment complex identified by Paper. Ross observed a short, African American male with a white t-shirt, who Ross identified as Brooks, approach Johnson's car. Ross also testified he monitored the conversation in Johnson's car and, based on the circumstances and the monitored conversation, he believed a drug transaction had occurred.

The second witness for the United States was Pressley, the undercover officer who accompanied Johnson during the drug transaction. Pressley corroborated Ross's account of the events and fleshed out the details of the drug transaction. Pressley admitted on cross-examination, however, that Brooks was in Johnson's car less than two minutes.

Seeking to bolster Pressley's identification of Brooks, the United States asked Pressley to discuss other occasions on which he had an opportunity to speak with Brooks.[1] Pressley explained that he contacted Brooks on October 11, 1995,

---

[1]Brooks' primary contention through opening statement, cross-examination of Ross and Pressley, and closing argument was that the United States had indicted the wrong man and that Ross' and Pressley's identifications of Brooks

by using a pager number given to him by Ross.[2]  Using the same pager number, Pressley paged Brooks again on October 12, 1995.  During that conversation, Brooks and Pressley agreed to meet at a grocery store parking lot.  Because Brooks was not present when Pressley arrived at the parking lot, Pressley paged Brooks again.  Brooks returned the call and arranged to meet Pressley in the grocery store parking lot.  Pressley testified that the man who met him in the parking lot on October 12 was Brooks, the same person he had met during the September 15th drug transaction.

The district court allowed the United States to play for the jury tape recordings of the September 6th and 15th monitored phone conversations between Johnson and Brooks.  Pressley testified that he had listened to the tape-recorded conversations and recognized the voices as Brooks and Johnson.

Brooks did not testify or call any witnesses on his behalf.  He argued vigorously in closing that the United States had not proven beyond a reasonable doubt that Brooks was the man known as "Paper" involved in the September 15th drug transaction.  Brooks stressed that neither Pressley nor Ross had a good

were unreliable.

[2]Ross obtained the pager number from a monitored telephone conversation between Johnson and Paper on September 6, 1995.  At trial, Pressley was shown a transcript of the September 6th phone conversation; he confirmed the number in the transcript was the same pager number he used to contact Brooks on October 11th.

opportunity to see the man they identified as Brooks. The jury returned a verdict of guilt.

## III.  ANALYSIS

*A.  Trial Error*

*1.    Admission of Tape-Recorded Conversation Regarding Uncharged Drug Transactions*

At trial, the United States sought to admit a tape recording of the September 6th telephone conversation between Brooks and Johnson, the confidential informant. Brooks sought to exclude the recording on the grounds that the recorded conversation was irrelevant and was inadmissible under Federal Rule of Evidence 404(b) because it was more prejudicial than probative. The district court concluded the conversation was admissible as prefatory action in anticipation of the September 15th transaction[3] and because it was probative of the issue of "Paper's" true identity. This court concludes the district court did not abuse its discretion in admitting the recorded conversation at trial because it was properly admissible under Rule 404(b) to demonstrate identity. *See United States*

---

[3]On appeal, the parties vigorously contest whether the September 6th recorded conversation constituted prefatory communications that were part and parcel of the September 15th transaction or, instead, simply unrelated bad acts evidence. In light of this court's conclusion, set out more fully below, that the September 6th recorded conversation was properly admitted under Rule 404(b), we need not address this issue.

*v. Wacker*, 72 F.3d 1453, 1468 (10th Cir. 1995) (setting forth abuse of discretion standard to district court's decision to admit evidence under Rule 404(b)).

Federal Rule of Evidence 404(b) provides that evidence of other crimes, acts or wrongs is generally not admissible. Such evidence is, however, admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). The Supreme Court has determined Rule 404(b) evidence is admissible if it satisfies the following four-part test: (1) the evidence is offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) upon request, the district court provides an appropriate limiting instruction. *See Huddleston v. United States*, 485 U.S. 681, 692 (1988).

Under the plain text of Rule 404(b) and this court's precedent, other acts evidence is properly admitted at trial to establish identity. *See* Fed. R. Evid. 404(b); *United States v. Oberle*, 136 F.3d 1414, 1419 (10th Cir. 1998). The first *Huddleston* factor is thus satisfied. The recorded conversation also satisfies the second *Huddleston* criteria because it was highly relevant to the issue of "Paper's" identity. *See id.* (past acts evidence relevant at trial were identity of perpetrator is focus of trial). During the September 6th conversation recorded by Ross, Brooks gave his pager number to Johnson. Pressley testified that he used

that same pager number to contact Brooks on several occasions in October, including one occasion that lead to a face-to-face meeting. Pressley further testified that he had listened to the September 6th recorded conversation and recognized, based on his subsequent telephone conversations and face-to-face meetings, the voice as that of Brooks. This evidence was highly probative in light of Brooks' only defense at trial being that of mistaken identity. Brooks argued that Ross and Pressley did not have sufficient opportunity to observe the man who sold cocaine base to Johnson and Pressley on September 15th. He further argued that the officers had confused him with his brother Cederic Brooks, a convicted drug dealer who allegedly looks very similar to Brooks. Thus, although the September 6th recorded conversation was prejudicial in that it related to prior bad acts, the district court did not abuse its discretion in concluding the highly probative nature of the evidence outweighed its prejudicial effect. Finally, although the jury was not given a limiting instruction regarding the September 6th recorded conversation, Brooks did not request such an instruction. Because each of the four *Huddleston* factors were met here, this court concludes the district court did not abuse its discretion in admitting the evidence under Rule 404(b).

2. *Admission of Testimony Regarding an Uncharged Drug Transaction*

Prior to trial, in response to Brooks' request for disclosure of Rule 404(b) evidence, the United States indicated that it intended to elicit testimony from

Pressley regarding his meeting with Brooks on October 12th. The United States represented that it intended to elicit testimony regarding the October 12th meeting for the limited purpose of demonstrating Pressley's ability to identify both the voice and person of Brooks. The United States reiterated these representations on the date of the trial. Based on the United States' representations about the limited nature of the testimony it would elicit regarding the October 12th meeting, Brooks did not initially object to Pressley's testimony regarding the meeting.

When Detective Pressley took the stand at trial, the United States began laying a foundation for Pressley's testimony regarding the October 12th meeting through the use of carefully tailored leading questions. In response to a question regarding what he did on October 12th at a particular time, Pressley responded, "On that date I had conversation with the defendant and expressed that I wanted to purchase --." At that point, the prosecutor quickly cut off Pressley, stating, "Excuse me. Without going into the substance of the conversation, did you have a conversation with him." Brooks then moved for a mistrial because the jury had learned the purpose of the October 12th meeting. The district court denied the motion for a mistrial, but gave the jury a lengthy cautionary instruction.[4]

_____

[4]The district court instructed the jury as follows:
I want to give you a cautionary instruction because we have now had testimony by Detective Pressley about a meeting – he's about to testify concerning a meeting and various conversations that he'd had with the defendant arranging the meeting that are alleged to be with

Brooks' argument on appeal is two-fold. He first argues the district court abused its discretion in allowing the United States to elicit testimony regarding telephone conversations between Brooks and Pressley planning the October 12th meeting and in eliciting testimony regarding the location of the meeting. Second, Brooks argues the district court abused its discretion when it failed to declare a mistrial after Pressley's stray remark regarding the purpose of the October 12th meeting.

In arguing the district court abused its discretion in allowing the United States to explore some of the circumstances leading up to the October 12th meeting, Brooks concedes the testimony, with the exception of Pressley's stray remark, satisfies the first, second, and fourth requirements set out in *Huddleston*.[5]

the defendant arranging the meeting other than those with which the defendant is charged, in other words, the charge involved a date certain, that is, September 15, 1995.

I want to remind you that the defendant is charged only with . . . the allegation of distribution of cocaine base on September 15, 1995. Obviously, this other testimony relates to a meeting and the arrangements for a meeting with Detective Pressley other than that charged. This evidence is received for the limited purpose only of demonstrating the identification of the defendant and explaining how Detective Pressley was able to identify the defendant. Such evidence may not be considered by you as proof that the defendant is automatically guilty of the specific offense with which he is charged, but is relevant as to any question of his identification of the defendant and is received for that limited purpose only.

[5]Brooks concedes the United States articulated the precise evidentiary basis for the testimony, the testimony was relevant, and the district court gave an appropriate cautionary instruction.

He argues, however, that the United States failed to comply with its pre-trial promises of limited admissibility when it elicited foundational testimony about conversations leading up to, and the location of, the October 12th meeting. In so doing, according to Brooks, the United States elicited testimony more prejudicial than probative when it left the clear impression that Brooks had participated in additional drug transactions.

This court has closely reviewed Pressley's testimony regarding telephone conversations leading up to the October 12th meeting, as well as the testimony regarding the location of that meeting. That review leads this court to conclude that the United States was appropriately circumspect in its questioning of Pressley and that it succeeded in wringing the prejudicial "other crimes" aspects out of Pressley's testimony regarding the October 12th meeting. We also agree with the district court that much of the challenged testimony was necessary "to lay the foundation for where and when things occurred." Accordingly, the district court did not abuse its discretion in admitting the background information regarding the October 12th meeting. *See Wacker*, 72 F.3d at 1468 (holding district court's admission of evidence pursuant to Fed. R. Evid. 404(b) reviewed for abuse of discretion).

Brooks also argues the district court abused its discretion when it failed to grant a mistrial following Pressley's stray remark regarding the purpose of the

October 12th meeting. "A ruling on a motion for mistrial is within the sound discretion of the district court and will not be disturbed absent a clear abuse of that discretion." *Id.* at 1466. As noted above, the United States acted appropriately in minimizing the prejudicial "other crimes" aspects of Pressley's testimony and quickly cut off Pressley when he began to explain the purpose of the October 12th meeting. When Brooks objected and sought a mistrial, the district court immediately gave the jury a detailed cautionary instruction. *See United States v. Castillo*, 140 F.3d 874, 884 (10th Cir. 1998) ("A central assumption of our jurisprudence is that juries follow the instructions they receive."). In light of the district court's superior perspective in assessing the impact of Pressley's stray remark and its strong cautionary instruction, this court concludes the district court did not commit a "clear abuse of discretion" when it denied Brooks' motion for mistrial. *See Wacker*, 72 F.3d at 1466.

3. *Failure to Excuse Juror For Cause*

Brooks asserts the district court erred in denying his challenge for cause of potential juror Tuan Nguyen. During *voir dire*, Nguyen stated that his father had been a colonel in the Vietnamese Army and that his duties included commanding drug control operations in South Vietnam. Nguyen further testified that he had "strong feelings about drug[s], using of drug[s]." Despite this fact, Nguyen attested that he did not have any connections to or special knowledge about drugs;

-12-

did not have any strong feelings which would interfere with his ability to be a fair juror; and that he would follow the court's instructions on Brooks' constitutional rights, including the presumption of innocence and the government burden of proving guilt beyond a reasonable doubt.

Based on the past occupation of Nguyen's father, Brooks contends the district court was obligated, as a matter of law, to dismiss Nguyen for cause based on implied bias. *See Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir. 1996) (holding a potential juror may be found impliedly biased based on similarities between that juror's experiences and the facts giving rise to the trial, even if the juror has no personal connection to the parties or circumstances of the trial), *cert. denied*, 117 S. Ct. 1342 (1997). While we seriously doubt the merits of Brooks' argument regarding implied bias, this court need not resolve the issue. Even if the denial of the challenge for cause was error, it was harmless because Nguyen was removed by a peremptory challenge. *See Staley v. Bridgestone/ Firestone, Inc.*, 106 F.3d 1504, 1513-14 (10th Cir. 1997) (holding that where district court erroneously denied a challenge for cause but plaintiff used peremptory challenge to remove challenged juror, and made no allegation that jury as seated was biased, error was harmless); *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122-23 (10th Cir. 1995) (same). Based on *Staley* and *Getter*, even assuming the district court

erred in refusing to dismiss Nguyen for cause, such error is harmless because Brooks has not alleged that any of the jurors actually seated were biased.

In an effort to distinguish his case from *Staley* and *Getter*, Brooks argues that he can demonstrate prejudice flowing from the loss of the peremptory challenge. Stated in stark but accurate terms, Brooks' argument is that he was prejudiced because he had to waste a peremptory which he could have instead used to racially construct the venire, with the ultimate goal of seating an African-American on the jury.[6] The problem with Brooks' argument is two-fold. First, although Brooks does "have the right to be tried by a jury whose members are selected by nondiscriminatory criteria," he has no right to a "'petit jury composed in whole or in part of persons of [his] own race.'" *Powers v. Ohio*, 499 U.S. 400,

---

[6]Brooks argues as follows:

Although this Court has held that loss of a peremptory challenge is not per se reversible error . . . in this instance the harm went beyond merely being compelled to use a peremptory challenge on Mr. Nguyen. The inability of Mr. Brooks to use his peremptory challenge on someone other than Juror Nguyen may have affected the racial composition of the jury.

The jury that convicted Mr. Brooks contained no African-Americans. However, according to trial counsel and the defendant, there were at least two African-Americans in the venire who were never questioned because a jury was empaneled prior to those juror's [sic] being called. . . . In a district such as the district of Colorado, which has a very low population of African-Americans, such a denial has a great effect on an African-American defendant. Accordingly, the district court's failure to grant a challenge for cause was not harmless error.

Appellant's Opening Brief at 20-21.

-14-

404 (1991) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305 (1880)). Second, this court has specifically held that a district court's allegedly erroneous denial of a challenge for cause must be reviewed for harmless error without regard to "its effect on [a litigant's] peremptory challenges." *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1123 (10th Cir. 1995). Accordingly, the fact that Brooks could have used the peremptory he "wasted" on Nguyen on other members of the venire is of no moment as long as Brooks received all of the peremptory challenges allowed by statute and the jury seated was not biased. *See id.*; *Staley*, 106 F.3d at 1514.

*4. Failure to Hold Hearing Regarding Potential Juror Misconduct*

Brooks asserts the district court erred in failing to conduct a hearing about potential misconduct on the part of juror Carol Kimberly. On the first day of trial, before jury selection had been completed, defense counsel observed Kimberly smoking a cigarette outside during lunch break and talking with two uniformed security officers. Kimberly was observed standing by the security officers for at least ten minutes. Immediately after the lunch break, Brooks brought the incident to the district court's attention. Brooks asked the district court to inquire of Kimberly whether she had discussed the case with the security officers. After conducting a brief hearing on the issue with counsel, the district court ruled as follows: "People do go outside to smoke. You know, the more I

think about it, I think it would be better just not to do anything about this. I don't think its grounds for cause."

Relying on the Supreme Court decision in *Remmer v. United States*, 347 U.S. 227 (1954), Brooks argues that the district court committed reversible error when it failed to question Kimberly about her contacts with the security officers during the lunch break. In *Remmer*, the trial court learned that one of the jurors had received a communication advising him that he could profit by bringing in a verdict favorable to the defendant. *See id.* at 228. Without informing the defendant, the trial court ordered the FBI to investigate the incident *See id.* Based on the results of that investigation, the trial court concluded that the defendant had not been prejudiced by the comment. *See id.* When the defendant learned of the incident some time later, he brought a motion for a new trial with a request for a hearing on the incident. *See id.* at 228-29. The district court refused to hold a hearing and denied the motion for a new trial. *See id.* The Supreme Court reversed, holding the trial court erred in failing to conduct a hearing, with the participation of the defendant, to determine the effect of the comment on the jury. *See id.* at 229-30. In reaching this conclusion, the court held as follows: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about a matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." *Id.* at 229.

-16-

*Remmer*'s presumption of prejudice does not apply under the circumstances of this case. Brooks' assertions to the contrary notwithstanding, the mere fact of a juror conversing with a third-party does not raise the *Remmer* presumption. Instead, the presumption arises only when there has been a communication or contact "about the matter pending before the jury." *Id.*; *see also United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997) (holding that "an allegation of an unauthorized communication with a juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict"), *cert. denied*, 67 U.S.L.W. 3203 (Oct. 5, 1998). To hold otherwise would require a *Remmer* hearing based on each of the multiple ordinary incidental contacts between non-sequestered jurors and virtually any other person during the course of a trial.

The record does not contain any evidence that Kimberly had any discussion with the security officers "about the matter pending before the jury." *Remmer*, 347 U.S. at 229. Nor does the record contain any evidence that the officers were in any way connected to the Brooks case. Instead, Kimberly was simply observed smoking during the lunch break in front of the courthouse and conversing with the officers. Furthermore, as noted by the United States, immediately prior to the lunch break, the district court specifically instructed the jurors not to "discuss this case among yourselves or with anyone else." *See Castillo*, 140 F.3d at 884 ("A central assumption of our jurisprudence is that juries follow the instructions they

-17-

receive."). Under these circumstances, the *Remmer* presumption did not arise and the district court did not err in refusing to hold a hearing regarding the matter. *See Frost*, 125 F.3d at 377 (holding *Remmer* presumption did not arise and *Remmer* hearing not required where juror had contact with employees of the Clerk of the Court during jury deliberations, because defendant "presented no basis upon which to believe [the juror] . . . had experienced an external contact or communication regarding matters pending before the jury during her absence from the deliberations").

### B. Sentencing Error

### 1. Distinction Between Crack and Powder Cocaine

Brooks notes that for purposes of calculating a defendant's base offense level, the Sentencing Guidelines equate one gram of crack to 100 grams of powder cocaine. *See* U.S.S.G. § 2D1.1(c) (Drug Quantity Tables). Brooks argues that the distinction between powder and crack cocaine violates his Fifth Amendment rights to due process and equal protection, as well as his Eighth Amendment right to be free from cruel and unusual punishment. As Brooks recognizes, however, these arguments are foreclosed by Tenth Circuit precedent. *See, e.g., United States v. Robertson*, 45 F.3d 1423, 1444-46 (10th Cir. 1995); *United States v. Angulo-Lopez*, 7 F.3d 1506, 1508-09 (10th Cir. 1993); *United States v. Easter*, 981 F.2d 1549, 1556, 1558-59 (10th Cir. 1992). This panel is

bound by the cases set out above absent *en banc* reconsideration or a superseding contrary decision by the Supreme Court. *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam).

*2. Calculation of Base Offense Level Based On Distribution of Crack*

In a *pro se* supplemental brief, Brooks argues that his base offense level was improperly calculated based on distribution of crack cocaine rather than powder cocaine. The United States has addressed the issue on the merits in its answer brief. Although we ultimately conclude the claim is without merit, Brooks' contentions are not frivolous. Accordingly, this court grants Brooks' motion to file a supplemental brief and addresses his *pro se* claim on the merits. Nevertheless, because Brooks did not raise this issue before the district court, this court's review of the issue will be solely for plain error. *See United States v. Toro-Pelaez*, 107 F.3d 819, 827 (10th Cir.), *cert. denied*, 118 S. Ct. 129 (1997).

During trial, the United States presented the testimony of chemist Mary Kimmett. Kimmett testified that the substance obtained in the controlled buy from Brooks was a "chunk material" and that a series of tests revealed that the chunk material contained cocaine base. Kimmett further testified that cocaine base is commonly known as crack cocaine and that crack is typically made by cooking powder cocaine with baking soda in water. In addition, Brooks' counsel conceded during his closing argument that the United States had proven beyond a

reasonable doubt that the substance in question was crack, calling the issue a "no-brainer."[7]

Despite this evidence, Brooks asserts that calculating his base offense level on the basis of distribution of crack cocaine was plain error because there was no evidence before the district court that the cocaine base in question contained sodium bicarbonate/baking soda. In support of this contention, Brooks cites Amendment 487 to the Sentencing Guidelines, which amended the notes to the drug quantity tables set out in § 2D1.1(c). Amendment 487 provides as follows: "'Cocaine base,' for purposes of this guideline, means 'crack.' 'Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. app. C, Amend. 487; U.S.S.G. § 2D1.1(c), Note (D). Based on the language of Amendment 487, Brooks asserts that Kimmett's testimony at trial that the substance in question was a form of cocaine base commonly referred to as crack is insufficient to support the district court's decision to calculate his base offense level based on distribution of crack rather than powder cocaine. Instead,

_____

[7]This trial testimony readily distinguishes this case from the facts in *United States v. James*, 78 F.3d 851 (3ᵈ Cir.), *cert. denied*, 117 S. Ct. 128 (1996). In *James*, the court concluded that it was error to apply the enhanced sentencing provisions for crack when the only evidence before the trial court was a single "casual reference" to crack by the government during the plea colloquy. *Id.* at 856-58. Kimmett's testimony provided far more than the "casual reference" found insufficient by the Third Circuit in *James*.

according to Brooks, the United States was obligated to prove that the "crack" in question contained sodium bicarbonate before the enhanced sentencing for crack cocaine would apply.

Two recent unpublished dispositions of this court rejected the exact arguments advanced by Brooks. *See United States v. Marks*, No. 96-3351, 1997 WL 622387, at *1-*2 (10th Cir. Oct. 9, 1997) (unpublished disposition), *cert. denied*, 118 S. Ct. 1095 (1998); *United States v. Holloway*, No. 97-1008, 1997 WL 527621, at *1-*2 (10th Cir. Aug. 27, 1997) (unpublished disposition). The *Holloway* court noted as follows:

> [Defendant] argues that the district court incorrectly applied the enhanced penalties for crack-related crimes because sodium bicarbonate was not present in the substance found in his possession. Note (D) to the Drug Quantity Table of the guidelines provides that:
>> "Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form."
>
> U.S.S.G. § 2D1.1(c), Note (D). [Defendant] reads this definition to require that any substance identified as "cocaine base" must be shown to contain sodium bicarbonate before it may be treated as "crack" for sentencing purposes.
>
> Notes or commentary to the sentencing guidelines are considered binding authority unless either violative of the Constitution or a federal statute, or clearly inconsistent with the guideline commentary [it] purports to explain. Therefore, we must construe the Guidelines' use of the term "cocaine base" in accordance with the definition set out in Note D. Because [Defendant's] interpretation would require us to ignore the word "usually" in that definition, we reject it.

-21-

We interpret the qualifier "usually" in the phrase "usually prepared . . . with sodium bicarbonate" as an acknowledgment that other methods of crack preparation exist and that not all forms of "cocaine base" need contain sodium bicarbonate to qualify as crack for sentencing purposes. Indeed, it appears that the method which uses sodium bicarbonate is the least sophisticated and yields the lowest purity. Although the laboratory report does not indicate the presence of sodium bicarbonate in the cocaine base tested, the district court was correct to apply the enhanced penalties for crack-related crimes to [Defendant's] case.

*Holloway*, 1997 WL 527621, at \*1-\*2 (citations omitted); *see also Marks*, 1997 WL 622387, at \*2 ("The government need not prove the presence of [sodium bicarbonate] before § 2D1.1(c) applies. The [Sentencing] Commission's reference to sodium bicarbonate is merely an example.").

Although *Marks* and *Holloway* are not binding on this panel, 10th Cir. R. 36.3, we find them persuasive and adopt their analysis. Because this court rejects Brooks' claim that only cocaine base containing sodium bicarbonate is crack for purposes of Amendment 487 and § 2D1.1(c), and because the evidence at trial demonstrated by a preponderance of the evidence that the material in question was "street-form" crack rather than unprocessed cocoa paste, the district court did not commit any error, let alone plain error, in calculating Brooks' base offense level premised on distribution of crack.

## IV. CONCLUSION

For all of the reasons set out above, the judgment of conviction and sentence in this case are hereby **AFFIRMED**.