# United States Court of Appeals
## For the First Circuit

Nos. 05-1684, 05-1685, 05-1686

UNITED STATES OF AMERICA,

Appellee,

v.

TOMÁS GARCÍA-CARRASQUILLO, a/k/a LELE;
JOSÉ R. CLAUDIO-GARCÍA; and
REYNALDO GONZÁLEZ-RIVERA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

John Ward-Llambias, for appellant García-Carrasquillo.
José F. Quetglas-Jordán, with whom Quetglas Law Offices was on brief, for appellant Claudio-García.
Terrance J. McCarthy, for appellant González-Rivera.
Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, was on brief, for appellee.

April 3, 2007

**TORRUELLA**, **Circuit Judge**. Co-defendants-appellants Tomás García-Carrasquillo, José R. Claudio-García, and Reynaldo González-Rivera were convicted of multiple counts involving the possession of drugs and firearms. On appeal, García-Carrasquillo and Claudio-García challenge the sufficiency of the evidence against them, and González-Rivera challenges various aspects of his sentence. After careful consideration, we affirm García-Carrasquillo's and Claudio-García's convictions, but we vacate González-Rivera's sentence and remand for re-sentencing due to the inadequacy of the district court's explanation for selecting the sentence imposed.

## I. Background

### A. The Scene of the Crime

On May 9, 2003, at approximately 5:45 p.m., Agents Héctor Valentín and Nelson González-Rodríguez of the Puerto Rico Police Department's Special Arrests and Extraditions Division established surveillance of a residence in the Río Grande area of northeastern Puerto Rico, in relation to two local felony arrest warrants for García-Carrasquillo and a fugitive arrest warrant for Claudio-García.[1] The split-level house consisted of the main residence on the upper level, and a small ground-level apartment accessed by a door under a carport at the front of the house. The carport stood over a driveway that led to a gate and then out to the road in

---

[1] Claudio-García had been serving a sentence at Camp Santana, a Puerto Rico institution for minors, when he left on a three-day pass and never returned.

front of the house. The agents parked their unmarked car on the road approximately 100 meters up a hill from the house, where they could observe activity around the house with binoculars. From their vantage point, they could see a Ford Bronco parked under the carport at the front of the house. They could not see the door to the ground-level apartment located behind the Bronco, nor could they see a short staircase on the left side of the carport.[2] They could, however, see the staircase leading to the main entrance on the upper level of the house.

Around two hours later, a stolen Mazda Protegé[3] pulled up and parked on the road in front of the house, outside a gate across the driveway. García-Carrasquillo and Claudio-García exited the vehicle and entered the carport, presumably to enter the ground-level apartment at the rear of the carport, though it is unclear whether the agents actually saw the men enter, or later exit, through the door to the apartment.[4] Fifteen minutes later, García-Carrasquillo walked out from under the carport carrying an assault

---

[2] It is not clear where this staircase led.

[3] The agents had previously followed García-Carrasquillo's girlfriend to the same residence, where she had left with an unknown individual in the same Mazda Protegé, which the agents then determined had been stolen from an auto dealer.

[4] Agent González-Rodríguez testified that he could not see the apartment door at any time, while Agent Valentín testified that at some point during the surveillance he observed both men entering and exiting through the apartment door.

rifle, which he placed in the trunk of the Mazda Protegé. He then returned to the carport.

At this point, the agents notified their supervisor, Lieutenant Herminio Díaz, of the situation. Lieutenant Díaz mobilized the SWAT team and posted two agents, José Nevárez Ortiz and Richard Carrera, at the back of the house. As the SWAT team approached the house, José David Cruz-González, the owner of the house, who was somewhere outside the gate across the driveway in front of the house,[5] ran through the gate toward the house shouting that the police were there. The three co-defendants in the case, García-Carrasquillo, Claudio-García, and González-Rivera, then ran out of the ground-level apartment and joined Cruz-González in fleeing towards the back of the house.

At the back of the house, the four men jumped over a fence and continued to run. Agent Nevárez shouted for the men to stop and told them they were under arrest. The fleeing men and the officers then exchanged gunfire; González-Rivera was shot in the leg. The men continued to run and exchange gunfire with the pursuing police until the four men fell into a large hole in the ground,[6] where they were apprehended and arrested. The three co-

---

[5] Agent González-Rodríguez testified at one point that Cruz-González was "just lying" in the road in front of the house.

[6] According to Agent González-Rodríguez, the "big hole" was approximately ten feet long by ten feet wide and eight feet deep, and was possibly part of a septic tank under construction.

-4-

defendants were each found with loaded firearms on their persons; however, no drugs or paraphernalia were found on any of the defendants at the time of their arrest.

Meanwhile, back at the house, the SWAT team, Lieutenant Díaz, and Agent Valentín searched the ground-level apartment, where they found a large amount of cocaine and cocaine base (crack cocaine), a small amount of marijuana, and assorted drug paraphernalia, including a stove for cooking crack cocaine and items used to break up cocaine rocks. The cocaine base was packaged in approximately 972 vials, which were placed in plastic bags labeled by drug distribution point. The Mazda Protegé was taken to the police station after the arrest; when the police opened the trunk, they found an AR-15 rifle along with the AK-47 that the agents had seen García-Carrasquillo put there during their surveillance. The police did not take any fingerprints from the drugs, paraphernalia, or firearms recovered from the apartment or the vehicle, nor from the firearms found on the defendants at the time of their arrest.

**B. Legal Proceedings**

On May 10, 2003, the defendants were taken before a local magistrate judge for a probable cause hearing. After the judge advised the defendants of their right to remain silent, García-Carrasquillo voluntarily disclosed that all of the drugs and firearms seized the previous day belonged to him.

On December 17, 2003, a grand jury returned a seven-count Superseding Indictment against the defendants.[7] Counts One and Two charged that all three defendants, aiding and abetting each other, knowingly possessed with the intent to distribute 96.87 grams of cocaine base and 299.96 grams of cocaine, respectively, in violation of 21 U.S.C. § 841(a)(1). Count Three charged García-Carrasquillo with knowingly possessing certain firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Count Four charged all three defendants with knowingly using, carrying, and discharging certain firearms in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(iii), (C)(i). Counts Five and Six charged García-Carrasquillo and González-Rivera, respectively, with being a felon in possession of certain firearms in violation of 18 U.S.C. § 922(g)(1). Count Seven charged Claudio-García with being a fugitive in possession of certain firearms, also in violation of 18 U.S.C. § 922(g)(2).

The defendants were tried over nine days in March and April of 2004. At the close of the government's case, the defendants moved for judgments of acquittal on the ground of insufficient evidence; the district court denied the motions. The court also denied the defendants' renewed motions for judgment of

---

[7] Cruz-González was also charged in the same indictment, but the district court granted his motion to sever prior to trial.

acquittal the following day.  On April 22, 2004, a jury acquitted all three defendants of Count Four, and also acquitted González-Rivera of Count Six, but found the three defendants guilty on all other counts as charged.

On April 5 and 7, 2005, the district court sentenced the three defendants.  Only González-Rivera challenges his sentence, and therefore his is the only sentence we will discuss in detail.[8] González-Rivera's presentence report ("PSR") calculated an initial base offense level of 32 pursuant to U.S.S.G. § 2D1.1, after converting the quantities of cocaine base and cocaine powder into an equivalent quantity of marijuana using the Drug Equivalency Table.  The PSR also recommended a two-level enhancement for possession of a firearm in relation to a drug trafficking offense, U.S.S.G. § 2D1.1(b)(1), and another two-level increase for "recklessly creat[ing] a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," id. § 3C1.2.  Utilizing González-Rivera's criminal history category of IV, the PSR calculated an advisory guideline range of 262 to 327 months imprisonment.

---

[8]  García-Carrasquillo and Claudio-García were each sentenced to 262 months imprisonment on Count One, 240 months on Count Two, and 120 months on Counts Five and Seven respectively, to be served concurrently.  In addition, García-Carrasquillo was sentenced to another 120 months on Count Three, to be served consecutively to the other terms.

González-Rivera objected to the PSR on two grounds: (1) that the two recommended enhancements were inapplicable because the jury acquitted him of all firearms charges, and therefore application of the enhancements would violate his Sixth Amendment right under Blakely v. Washington, 542 U.S. 296 (2004) (requiring that facts used to increase a defendant's sentence beyond the statutory maximum set by state sentencing guidelines be found by a jury);[9] and (2) that if the court applied the two-level increase for possession of a firearm, the sentencing guidelines prohibited imposition of the second two-level enhancement for obstruction of justice because the same conduct was the basis of both adjustments, see U.S.S.G. § 3C1.2 cmt. n.1.

The government responded by arguing that Blakely did not apply to the federal sentencing guidelines. The probation officer also responded to the defendant's objections, arguing that even though González-Rivera had been acquitted of the firearms charges, the corresponding enhancement could still be applied pursuant to U.S.S.G. § 1B1.3 because he aided and abetted others who were convicted of possessing firearms during the commission of the same offense. The probation officer also argued that the obstruction of justice enhancement applied because González-Rivera created a substantial risk of injury to others in the course of fleeing from

---

[9] United States v. Booker, extending Blakely to the federal sentencing guidelines, had not yet been decided. See 543 U.S. 220, 243-44 (2005).

the police, by acting with the other defendants who were in possession of firearms.

At González-Rivera's sentencing hearing, defense counsel first presented mitigating factors, including the terrible devastation suffered by González-Rivera when his brother, working in the United States, shot and killed his work supervisor; and González-Rivera's dramatic spiritual awakening, evidenced by the fact that he is now serving as a pastor at his correctional facility. González-Rivera's counsel then reiterated his objections to the PSR, and requested a sentence of 168 months, which was the low end of the 168 to 210 months guidelines range without application of the two recommended enhancements.

The government argued that the court should apply the two enhancements and impose a sentence at the top of the guidelines range due to the large amounts of drugs and guns seized and the defendant's attempt to flee the scene. The government also noted González-Rivera's criminal history, which indicated that he "lived a life of crime" from 1996 to 2003, and his lack of a repentant statement with respect to the instant crime.

After hearing the two sides' arguments, the district court imposed a sentence of 210 months imprisonment for each count, to run concurrently, followed by supervised release for five years

as to Count One and three years as to Count Two, to run concurrently.[10]  The district court explained:

> The Court has considered all the applicable adjustments under the now Advisory Federal Sentencing Guidelines, as well as the other sentencing factors set forth in 18 [U.S.C. §] 3553(a), namely the nature and circumstances of the offenses and defendant's history and characteristics, the need to promote respect for the law and provide just punishment in light of the seriousness of the offense, deterrence, the protection of the public from further crimes of the defendant, rehabilitation, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## II. Sufficiency of the Evidence

García-Carrasquillo and Claudio-García both appeal their convictions on the ground that there was insufficient evidence linking them to the drugs and paraphernalia found in the house from which they fled before being arrested.  See Fed. R. Crim. P. 29 ("[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.").  We review sufficiency of the evidence challenges de novo, affirming the conviction if, after viewing all the evidence in the light most favorable to the government and indulging all reasonable inferences in the government's favor, a

---

[10]  The district court also imposed various conditions, not relevant here, as well as a special monetary assessment of $200 as required by law.

rational factfinder could conclude that the prosecution proved all elements of the crime beyond a reasonable doubt.  United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003).

In order to prove possession with intent to distribute, the government must show that the defendants knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute. United States v. López-López, 282 F.3d 1, 19 (1st Cir. 2002). "Constructive possession exists when a person knowingly has the power and intention at a given time to exercise dominion and control over an object either directly or through others." United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005) (internal quotation marks omitted).  While mere presence on the property, proximity to the drugs, or association with the possessor is not sufficient, United States v. Barnes, 890 F.2d 545, 549 (1st Cir. 1989), the government may rely entirely on circumstantial evidence to show constructive possession.  United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) ("The attendant circumstances tell the tale[,] and the culpability of a defendant's presence hinges upon whether the circumstances fairly imply participatory involvement.").

In order to prove aiding and abetting, the government must first establish the commission of the offense by the principal, and then prove that "the defendant consciously shared

-11-

the principal's knowledge of the underlying criminal act, and intended to help the principal." United States v. Henderson, 320 F.3d 92, 109 (1st Cir. 2003); see also United States v. Rodríguez-Alvarado, 985 F.2d 15, 17-18 (1st Cir. 1993) (requiring that the government show "that the defendant associated himself with the commission of the offense, participated in it as something that he wished to bring about, and sought by his actions to make it succeed"). Again, mere association with the principal or presence at the scene of the crime is insufficient, even with knowledge that the crime is to be committed. United States v. Hyson, 721 F.2d 856, 862 (1st Cir. 1983).

We can quickly dispose of García-Carrasquillo's claim that there was insufficient evidence to support his conviction for possession. The day after the defendants were arrested, they were taken before a state magistrate judge for a probable cause hearing. Although there was no written record of that hearing, Agent Valentín testified at trial that after the magistrate advised the defendants of their right to remain silent, García-Carrasquillo voluntarily admitted that all the weapons and drugs seized from the

house were his.[11]  His admission is unquestionably sufficient to support his conviction.[12]

The sufficiency of the evidence against Claudio-García is a much closer question.  He argues that there was insufficient evidence of his constructive possession because there was no evidence that he had dominion or control over the drugs.  He also challenges the sufficiency of the evidence of aiding and abetting, arguing that there was no evidence that he willfully intended to help García-Carrasquillo in the crime of possession with intent to distribute.  Claudio-García asserts that the evidence proves, at most, that he was merely present at the scene.

Having affirmed the sufficiency of the evidence that García-Carrasquillo was the principal, we need only satisfy ourselves that there was evidence presented from which a rational juror could infer that Claudio-García intended to aid García-

---

[11]  At trial, García-Carrasquillo's attorney objected to the admission of Agent Valentín's testimony regarding García-Carrasquillo's alleged admission, on the ground that the testimony required "independent corroboration," but the district court judge overruled the objection.  García-Carrasquillo does not appeal the admission of the evidence.

[12]  García-Carrasquillo does not challenge the sufficiency of the evidence as to other elements of the crime, particularly the specific intent to distribute the drugs.  Nonetheless, we find that the large amount and individual packaging of the drugs otherwise supports a conviction under 21 U.S.C. § 841(a)(1).  See United States v. Latham, 874 F.2d 852, 862-63 (1st Cir. 1989) (collecting cases supporting the proposition that "possession of large quantities of drugs justifies the inference that the drugs are for distribution").

Carrasquillo in his crime of possession with intent to distribute. If the government successfully proves aiding and abetting, it does not need to prove that Claudio-García himself actually or constructively possessed the drugs, since either theory of guilt alone would sustain his conviction. See 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); see also United States v. Fuller, 768 F.2d 343, 346 (1st Cir. 1985) ("[W]e find the evidence presented was more than sufficient to support the jury's verdict based on either theory, aiding and abetting or constructive possession.").

The evidence fairly demonstrates that Claudio-García was in hiding with his uncle, García-Carrasquillo, and traveled with him in a stolen car to the house where García-Carrasquillo kept a large quantity of individually packaged drugs; that he remained in the apartment with his uncle and the drugs for a couple of hours before the SWAT team arrived;[13] and that he then attempted to flee from the police, exchanging gunfire with them when they pursued. From this evidence, a rational juror could reasonably infer that Claudio-García accompanied his uncle to the house filled with drugs

---

[13]  Claudio-García asserts that there was no evidence that he was in the apartment because the agents could not see the door to the apartment from their vantage point.  Even if that were so, the jury could infer that the defendants were in the apartment based on the undisputed testimony that the defendants were seen entering and leaving the carport where the door to the apartment was located.

because García-Carrasquillo trusted his nephew enough to enlist his help in committing the crime charged. Cf. United States v. Rincón, 180 F. App'x 376, 379 (3d Cir. 2006) (allowing inference that drug dealer trusted defendant based on evidence that dealer left drugs with defendant, in part to support conviction for aiding and abetting in drug sale). The jury could further infer that Claudio-García was in fact so aiding his uncle, especially given that he knowingly ran from and shot at the police when they attempted to apprehend them. See López-López, 282 F.3d at 21 ("[The defendant] ran when he saw the police and hid in a field, which suggests awareness of guilt.").

Claudio-García correctly points out that there is another, more plausible explanation for his presence at the scene and his attempt to flee: He was an armed fugitive in hiding with a wanted family member, and he ran in order to avoid capture by the police. While this could be true, the government need not exclude every possible explanation. See United States v. Ortiz, 447 F.3d 28, 33 (1st Cir. 2006) ("[T]he possibility of innocuous explanations for [a defendant's] behavior does not foreclose the jury's contrary inferences."). Hence, there was sufficient -- albeit circumstantial and not particularly strong -- evidence that Claudio-García's presence at the scene and association with his uncle were not just "mere" presence and association, see Echeverri, 982 F.2d at 678 ("[A] defendant's 'mere presence' argument will

-15-

fail in situations where the 'mere' is lacking."), but rather that he was a culpable participant in García-Carrasquillo's crime of possession with intent to distribute, see United States v. Lema, 909 F.2d 561, 570 (1st Cir. 1990) ("[P]resence on a single occasion may support a conviction for aiding and abetting if the surrounding circumstances lead to a reasonable inference that the defendant must have been a knowing participant."). Therefore, we must affirm Claudio-García's conviction as well.

### III. González-Rivera's Sentence

González-Rivera makes three claims of error with respect to his sentence: (1) that the district court failed to adequately explain the reasons for choosing the sentence imposed; (2) that the district court violated his Fourteenth Amendment right to equal protection when it applied the disparate equivalency ratio between crack and powder cocaine;[14] and (3) that the sentence violates his Fifth Amendment right to due process and the Eighth Amendment prohibition on cruel and unusual punishment because it is based on the crack to powder cocaine disparity. We review these legal challenges de novo. United States v. Rivera, 448 F.3d 82, 84 (1st Cir. 2006). If an issue is not raised below, however, we review only for plain error. United States v. Carvell, 74 F.3d 8, 14 (1st Cir. 1996).

---

[14] We assume that he meant this as a Fifth Amendment challenge, since the Fourteenth Amendment applies only to the states. See Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954).

-16-

## A. Explanation for Sentence Imposed

In United States v. Jiménez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc), we outlined the appropriate post-Booker approach to sentencing under the federal guidelines to aid us in reviewing the reasonableness of a sentence. We directed trial courts to engage in a "sequential determination of the guideline range, including any proposed departures, followed by the further determination whether other factors identified by either side warrant an ultimate sentence above or below the guideline range." Id. An important prerequisite to our reasonableness analysis is the district court's reasoned explanation for the sentence imposed, as required by 18 U.S.C. § 3553(c). Id. at 519. This is true even if the sentence is within the guidelines range. See United States v. Turbides-Leonardo, 468 F.3d 34, 40-41 (1st Cir. 2006). We are, however, prepared to read a district court's less-than-explicit explanation in light of the record. United States v. Navedo-Concepción, 450 F.3d 54, 57 (1st Cir. 2006). "The more obvious the reasons for a [sentencing] choice, the less that needs to be explained." Id.

Although at times we have been willing to go to great lengths to infer the district court's reasoning from the record, "there are limits." United States v. Gilman, No. 06-1376, 2007 WL 686648, at *4 (1st Cir. Mar. 8, 2007). This case exceeds those limits. The district judge gave a one-sentence explanation of her

choice of sentence, which conclusorily stated that she had considered the appropriate adjustments and the § 3553(a) factors. She did not explain her guidelines calculation, nor did she include any reasoned analysis or reference any evidence that influenced her decision. She merely stated the sentence and paraphrased three of the seven enumerated factors, which she apparently considered important.

Furthermore, we are unable to discern the court's reasoning by looking to the record of the parties' arguments. The government argued for a sentence at the top of the guidelines range considering two enhancements, whereas the defendant requested a sentence at the bottom of the range without the enhancements, citing mitigating factors. The district judge did not explain whether she applied one or both recommended enhancements, what the applicable guidelines range was, whether she thought the defendant deserved a sentence at any point within a particular range, or whether she was influenced by either sides' arguments enough to depart from one of the two ranges under consideration.

Consequently, this case differs from other cases in which we were able to understand with a modicum of certitude the reasons behind the district court's choice of sentence by reviewing the sentencing record. See, e.g., United States v. Vázquez-Rivera, 470 F.3d 443, 448 (1st Cir. 2006) (affirming a sentence where the judge made clear findings on the record, referenced the sentencing

-18-

factors, and made an explicit statement of the factual basis of the sentence); Navedo-Concepción, 450 F.3d at 57-58 ("In this case, the district court's explicit concerns were the scope of the crime and the potential for dangerousness. Beyond that, the district court referred generally to 'the evidence presented during the trial' as justifying 'a sentence at the upper end of the advisory guidelines.'"); United States v. Scherrer, 444 F.3d 91, 94 (1st Cir. 2006) ("Taken at face value, these [mitigating] factors do at first seem to have weight; but the government gave some effective answers in the district court and it is fair to infer that the district court found them persuasive. That the district court did not elaborate on them--it said only that it took them into account--does not preclude the inference where the record explains it."); United States v. Alli, 444 F.3d 34, 41 (1st Cir. 2006) ("[Where the district court] simply stated, '[T]his is one of those cases . . . where I think the guidelines produce a sentence that is reasonable and perfectly consistent with the factors enumerated in the statute, 3553(a),' . . . we do not fault the judge for not speaking further about the § 3553(a) factors, given that none were raised for his consideration and, in his independent judgment, none were worthy of further discussion." (second and third alterations in original)).

The government argues that it is obvious that the district court chose not to apply the two recommended enhancements

and that it then adopted the government's arguments for a sentence at the top of the resultant guidelines range. While this is certainly a plausible reading of the record, even if it were true, the district court's explanation would be insufficient as a matter of law. Section 3553(c)(1) requires that the trial judge identify its reason for selecting a sentence at a particular point within a range exceeding twenty-four months. See Gilman, 2007 WL 686648, at *5 ("[T]he statement here does not identify the reason that the district court imposed a sentence in the middle of the guideline range rather than elsewhere within that range (which spans more than 24 months), in direct violation of Section 3553(c)(1)."). If the court below rejected the enhancements, which is by no means clear, the guidelines range of 168 to 210 months would exceed twenty-four months, and the court would have to explain why it chose the top of the range.

Because the court did not even approximate our Jiménez-Beltre approach nor provide any reasoned explanation for its determination, we will not infer several degrees of reasoning, including a specific explanation explicitly required by law, and guess what the district court was thinking. Therefore, on this ground,[15] we vacate González-Rivera's sentence and remand for

_____

[15]   To be clear, we reject any defense argument that we cannot uphold a reasonable sentence if the district court does not make an explicit statement of its reasons on the record. Our precedent is exceedingly clear that we can look to the record to clarify the judge's reasoning. That said, district court judges would do well

-20-

resentencing consistent with this opinion and prior precedent. Id. at *4 ("[I]f we are in fact unable to discern from the record the reasoning behind the district court's sentence, appellate review is frustrated and 'it is incumbent upon us to vacate . . .' the decision below to provide the district court an opportunity to explain its reasoning at resentencing.").

## B. Crack and Powder Cocaine Equivalency Ratios

The remainder of González-Rivera's arguments, none of which he raised below, involve the 100:1 equivalency ratio of crack to powder cocaine used to calculate his sentence. See United States v. Pho, 433 F.3d 53, 54-57 (1st Cir. 2006) (describing "the history of the disparate treatment of crack and powdered cocaine embedded in the federal sentencing guidelines (commonly referred to as the 100:1 ratio)"). In 1994, we upheld the sentencing distinction between crack and powder cocaine against both due process and equal protection challenges under the Fifth Amendment. United States v. Singleterry, 29 F.3d 733, 740-41 (1st Cir. 1994). We said that Congress had sufficient reasons for treating crack more harshly than powder cocaine, and that "there are racially neutral grounds for the classification that more plausibly explain its [disparate] impact on [minorities]." Id. (internal quotation marks and alteration omitted). González-Rivera offers no arguments

---

to make the sentencing process as transparent as possible, to avoid the possibility of remand on appeal. See Jiménez-Beltre, 440 F.3d at 521 (Torruella, J., concurring).

that we have not consistently rejected before, see Pho, 433 F.3d at 61-65 (rejecting a variety of arguments against the ratio, including those based on the Sentencing Commission's effort to ease the discrepancy), and even so, based on our clear precedent, there was obviously no plain error on the part of the district court in applying the equivalency ratios.

González-Rivera also challenges the equivalency ratio as so disproportional as to be unconstitutional under the Eighth Amendment. The First Circuit has not squarely decided this issue, but every other circuit has rejected the argument that the sentencing disparity between crack and powder cocaine constitutes cruel and unusual punishment. See United States v. Brooks, 161 F.3d 1240, 1247 (10th Cir. 1998); United States v. Brazel, 102 F.3d 1120, 1158 (11th Cir. 1997); United States v. Fraiser, No. 94-30287, 1995 WL 528004, at *1 (9th Cir. 1995) (unpublished opinion) (citing United States v. Harding, 971 F.2d 410, 414 (9th Cir. 1992)); United States v. Jackson, 59 F.3d 1421, 1424 (2d Cir. 1995); United States v. Smith, 34 F.3d 514, 525 (7th Cir. 1994); United States v. Fisher, 22 F.3d 574, 580 (5th Cir. 1994); United States v. Frazier, 981 F.2d 92, 96 (3d Cir. 1992); United States v. Levy, 904 F.2d 1026, 1034 (6th Cir. 1990); United States v. Thomas, 900 F.2d 37, 39 (4th Cir. 1990); United States v. Buckner, 894 F.2d 975, 980-81 (8th Cir. 1990); United States v. Cyrus, 890 F.2d 1245, 1248 (D.C. Cir. 1989). Moreover, we have stated many

times before that "[t]he decision to employ a 100:1 crack-to-powder ratio . . . is a policy judgment, pure and simple," and therefore it is up to Congress -- not the courts -- to adopt rational drug equivalency ratios.   Pho, 433 F.3d at 62-63.

Although this is enough to defeat González-Rivera's argument under a plain error standard, we also point out that a defendant seeking proportionality review under the Eighth Amendment must "demonstrate, at the threshold, an 'initial inference of gross disproportionality' between the 'gravity of [the] criminal conduct and the severity of the . . . penalty' imposed." United States v. Cardoza, 129 F.3d 6, 18 (1st. Cir. 1997) (internal citation omitted) (alterations in original).   We have previously upheld a 280-month sentence for the distribution of 85.3 grams of crack cocaine against an Eighth Amendment challenge.   United States v. Graciani, 61 F.3d 70, 76-77 (1st Cir. 1995).   Here, González-Rivera's sentence was seventy months less for a conviction involving over ten grams more crack.   We therefore cannot infer gross disproportionality in this case.

## IV. Conclusion

For the foregoing reasons, we affirm García-Carrasquillo's and Claudio-García's convictions, and we vacate González-Rivera's sentence and remand for resentencing.

**<u>Affirmed in part, vacated and remanded in part</u>**.