TORRUELLA, Circuit Judge,
dissenting as to Part II.B, Part II.C.l, and Part II.C.2.
As stated in Part II.A of my opinion for the court, my colleagues and I agree that the record supports the government’s allegations as to count one, ie., that appellants’ actions in planting drugs for the purpose of fabricating criminal cases constitutes a violation of 18 U.S.C. § 241. The government’s case charged in count two, however, conspiring to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) & 846, is a horse of another color.
I.
On carefully considering the distribution statute’s mental state requirement, legislative history, and the historical background surrounding its enactment, I believe that my colleagues’ conclusion in Part II.B of the court’s opinion — that the officers’ scheme of possessing and illegally planting controlled substances with the sole intent to fabricate grounds for a target’s unlawful arrest is tantamount to possession of controlled substances with an intent to distribute — asks far too much of both Congress’s purpose in creating such legislation and the statute’s expressly-stated specific intent requirement.
Firstly, I believe my colleagues’ analysis incorrectly centers on whether the officers’ actions could properly constitute “distribution,” an issue that is not before us and on which I offer no comment. Nor do I believe it appropriate for my colleagues to go as far as they have and conclusively hold that the officers’ actions here constitute distribution, see Maj. Op. at 23, 24 — that charge has not been presented to this court, and I believe it is a question best left unaddressed.
Specifically, the majority on this issue consistently analyzes appellants’ arguments on count two by focusing solely on their physical acts. See Maj. Op. at 16 *31 (“Because the express language of the statute encompasses defendants’ conduct ... we affirm their conviction under count two.”); (emphasis added); see also id. at 21 (“Congress contemplated that the provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970 would apply to the unlatvful conduct of law enforcement officers, like the conduct at issue here____”) (emphasis added). My colleagues troublingly continue down this path of blurring the distinction between the actus reus of one crime and the mens rea of another (distribution versus possession with intent to distribute) throughout their opinion. See Maj. Op. at 17-18 (citing case law describing courts’ broad construction of distribution); id. at 18 (“Defendants’ conduct here falls within the language of the statute.”) (emphasis added); id. at 35-36 (noting case law in which courts have taken a broad approach to what conduct or level of participation will satisfy the statute’s intent-to-distribute requirement; citing case law concerning whether defendants’ acts constituted distribution); id. at 22 (“To apply the statute to the conduct of these defendants is neither absurd nor does it threaten ... accepted law enforcement techniques.”) (emphasis added); id. at 23 (“[B]oth the language and the intent of § 841(a) is such that it applies to the conduct at issiie in this case.”).
Our concern on this appeal, however, is not the appellants’ conduct, but rather, the question of whether they held the requisite statutory mental state at the time they planted the drugs. Indeed, the officers here were not charged with the physical act of distribution; rather, they were charged with possession of controlled substances with the particular mental intent to distribute, a crime requiring a higher mental showing than the act of distribution. To conclude otherwise, as my colleagues now do, waters down the law’s specific intent element to nothing more than a general intent requirement.
Furthermore, I harbor serious misgivings as to my colleagues’ analytical approach because I believe it has the unwanted effect of removing the statute from its firmly planted and long-acknowledged legislative moorings. As discussed infra, Congress’s purpose in enacting the statute at issue (as confirmed by its historical background and legislative history) was to target the twin evils of drug abuse (in the form of personal consumption) and drug trafficking (in the sense of injection of drugs into society’s illicit channels). Significantly, neither of these elements is at play here.
Finally, I believe my reading of the statute’s prohibition against possession of controlled substances with an intent to distribute as requiring a higher mental showing than simply an intent to physically move a controlled substance is supported by the fact that no other judgment ever has been issued sustaining the government’s novel interpretation, namely, that an intent to falsify cases through planting evidence is commensurate with an intent to commit drug distribution. In fact, the entire sweep of federal criminal jurisprudence up to the present case lacks any precedent in which the planting of controlled substances with the purpose of fabricating criminal charges has been held to constitute an intent to violate our nation’s drug laws. This dearth of prosecutions and convictions on the books supporting such a statutory interpretation is not, in my view, coincidental. Nor, as my colleagues claim, do I believe that it may be explained away as a simple exercise of prosecutorial discretion; rather, I believe it is more likely the proper exercise of prosecutorial prudence, i.e., reJraining from overreach.
*32 The judiciary’s deafening silence in this respect naturally follows, however, when one considers the history, purpose, and administration of Congress’s controlled substances laws, all of which target drug abuse and/or drug trafficking, not the charges listed in count two. For these reasons, I respectfully dissent from the majority’s conclusion that the officers here held the requisite specific intent under 21 U.S.C. §§ 841(a)(1) & 846.
II.
To prove the substantive offense at issue, possession with intent to distribute, the government must establish that appellants “knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute.” United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir.2007) (emphasis added).[35] The task at hand boils down to this: to determine whether appellants’ intent to fabricate cases via planting controlled substances constitutes an intent to distribute within the meaning of what Congress has proscribed through the legislation in question.
A. Express Itself: Statute’s Plain Language
I begin with the statute’s language. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (stating the “starting point in every case involving construction of a statute is the language itself’ (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)) (internal quotation mark omitted)); see also Recovery Grp., Inc. v. Comm’r, 652 F.3d 122, 125 (1st Cir.2011). Section 841(a)(1) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the “Act” or “Controlled Substances Act”) provides that: “[I]t shall be unlawful for any person knowingly or intentionally” to “possess with intent to ... distribute ... a controlled substance.” 21 U.S.C. § 841(a)(1). The Act defines “distribute” as “to deliver (other than by administering or dispensing) a controlled substance or a listed chemical.” Id. § 802(11). It defines “deliver” as “the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship.” Id. § 802(8).
The majority accepts the government’s request that the court’s analysis end here and adopt a literal, mechanical reading of the statute. And at first blush, “distribute,” defined under the broadly-worded language of the statute to include delivery or transfer of a controlled substance, seems, potentially, to encapsulate the officers’ actions under count two: the officers took and received controlled substances from one individual and/or location, brought the drugs to the homes of their targets, and temporarily placed them in a location cognizant that another officer would soon thereafter seize the drugs.
But such a literal viewing of the underlying acts — focusing solely on the objective physical movement of the drugs — overlooks an important aspect of the plain language of the statute. To establish a violation of 21 U.S.C. § 841(a)(1)’s proscription against possession with intent to distribute, the government must show that the defendant knowingly and intentionally possessed a controlled substance with a very
*33 particular subjective purpose: to distribute. See 21 U.S.C. § 841(a)(1) (stating “it shall be unlawful for any person knowingly or intentionally” to “possess with intent to ... distribute ... a controlled substance”) (emphasis added); United States v. Pomales-Lebrón, 513 F.3d 262, 267 (1st Cir. 2008) (“To establish a violation of 21 U.S.C. § 841, the government must prove that defendant: (1) possessed [controlled substances], ‘either actually or constructively,’ (2) ‘did so with a specific intent to distribute the [controlled substances] over which [he] had actual or constructive possession,’ and (3) ‘did so knowingly and intentionally.’ ”) (quoting United States v. López-López, 282 F.3d 1, 19 (1st Cir.2002) (third alteration in original)). Thus, if the government cannot show that a defendant had the requisite statutory intent to distribute controlled substances at the time he possessed them, a conviction pursuant to 21 U.S.C. § 841(a)(1)’s proscriptions simply cannot stand. See United States v. Pope, 561 F.2d 663, 671 (6th Cir.1977) (“ ‘[I]ntent to distribute’ is an essential element of § 841(a)(1), [and] the Government retains the burden of proving that element beyond a reasonable doubt.”).
The majority claims that I confuse the question of specific intent with overall objective. See Maj. Op. at 19-20, 23-24. I do no such thing. Specific intent, as discussed infra, “requires more than a knowing violation of the law,” namely, that “[t]he defendant [ ] act with a bad purpose or with the objective of committing the act prohibited by the law.” United States v. Dyer, 589 F.3d 520, 533 (1st Cir.2009) (Torruella, J., concurring in part and dissenting in part) (citing cases). In contrast, motive or “ulterior intent” has been defined as “[t]he intent that passes beyond a wrongful act and relates to the objective for the sake of which the act is done.” Black’s Law Dictionary 882 (9th ed.2009); see also United States v. Boardman, 419 F.2d 110, 113-14 (1st Cir.1969) (accepting trial court’s jury instruction (for a different crime) generally distinguishing between motive and intent; noting trial court’s definition of motive as “that which tempts, induces or moves a person to commit a crime,” and intent as “the purpose or mental state with which the person does the act”).
When the officers here performed the disputed acts, they did not hold the requisite intent to engage in drug distribution; instead, their intent while planting the drugs was always to fabricate a case against a particular target in order to effectuate a seemingly lawful arrest of that mark. The officers’ motive, to the extent relevant, was provided to us in their briefs (the merits of which we need not and do not consider or address here, see United States v. Santistevan, 39 F.3d 250, 255 n. 7 (10th Cir.1994)):[36] to satisfy an alleged Department-mandated arrest quota. Thus, the majority’s contention that my analysis of the officers’ specific intent (i.e., their particular mental state at the time they planted the controlled substances) is nothing more than an analysis of the officers’ overall objective for performing such *34 acts (ie., performing seemingly lawful arrests to satisfy an alleged arrest quota) incorrectly frames my position.
To my reading, the majority does not adequately explain how a specific intent crime (possession with intent to distribute) may require the exact same intent showing as a general intent crime (distribution). See McKenzie v. Risley, 842 F.2d 1525, 1545 (9th Cir.1988) (noting “general and specific intent are distinct and different”). Nor do I find the majority’s conclusion that the officers’ underlying physical acts, if accepted to constitute drug distribution (which the majority does), are sufficient, in and of themselves, to prove a specific intent to distribute. Cf. Morissette v. United States, 342 U.S. 246, 276, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (fact that defendant performed actus reus of crime was relevant to whether defendant had intent to commit actual act of stealing, but was insufficient for purposes of showing the requisite mens rea of a specific intent to steal or convert property from another); Koehler v. United States, 189 F.2d 711, 715 (5th Cir.1951) (Russell, J., dissenting) (citing cases and noting “the fatal taint inflicted by the language of the judge with reference to the intent legally presumed to follow from the commission of acts,” which had the effect of negating the “well established rule of law that where wilfulness is an essential ingredient of an offense the specific intent must be proved as an independent fact and cannot be presumed as a matter of law from the commission of an unlawful act”); Hubbard v. United States, 79 F.2d 850, 853 (9th Cir.1935) (similar). While the act of distribution would undoubtedly be a relevant factor to consider when assessing the officers’ mental state, I do not believe (presuming distribution occurred) it should be the only one given the surrounding factual circumstances of this case, a point I address further infra. See United States v. Berrios, 676 F.3d 118, 137 (3d Cir.2012) (“[A] defendant’s specific intent is to be judged ‘[bjased upon the totality of all the surrounding facts and circumstances.’ ” (quoting United States v. Anderson, 108 F.3d 478, 485 (3d Cir.1997)) (emphasis added)).
I thus proceed to address the higher evidentiary intent bar that the government had to (and in my mind, failed to) clear in this case.
1. General Intent versus Specific Intent
It is a fundamental principle that the trier of fact generally must assess both a defendant’s actions and mind-set, splitting a crime into two parts: the actus reus of the crime (a physical act or omission, the performance (or lack thereof) of which the legislature has deemed unlawful), and the mens rea of the person committing the crime (the defendant’s intent or mental state at the time of the crime). When assessing mental intent, courts generally distinguish between two kinds: general and specific.
The former (general intent) requires a showing that a defendant intended to perform a certain act. His mental intent, however, need only be to perform the physical act itself, that is, the actus reus of a crime; he need not possess any intent to violate the law. See United States v. Veach, 455 F.3d 628, 631 (6th Cir.2006) (noting that a general intent crime “requires only that a defendant intend to do the act that the law proscribes” (quoting United States v. Gonyea, 140 F.3d 649, 653 (6th Cir. 1998))); United States v. Kleinbart, 27 F.3d 586, 592 n. 4 (D.C.Cir.1994) (“A general intent crime requires the knowing commission of an act that the law makes a crime.”); United States v. Phillips, 19 F.3d 1565, 1576-77 (11th Cir.1994) (“[A] defendant need not intend to violate the *35 law to commit a general intent crime, but he must actually intend to do the act that the law proscribes.”).
In contrast, where specific intent is required, a heightened mental state is a sine qua non. The government must show not only that a defendant had a general intent to perform a particular act, but also, that he possessed a corresponding mental state when executing such acts. That is, that the defendant performed the offending acts with the specific purpose of producing the law’s legally forbidden result, or the desired outcome of executing the actus reus was in fact to violate the law. See Dyer, 589 F.3d at 528 (describing a specific intent crime as one in which “the defendant specifically intended ... [the proscribed] outcome as his purpose,” or “purposefully and affirmatively desired [the proscribed] unlawful outcome”); see also Morissette, 342 U.S. at 265, 72 S.Ct. 240 (stating that a showing of “specific intent or purpose [ ] will require some specialized knowledge or design for some evil beyond the common-law intent to do injury.”); Oduche-Nwakaihe v. Att’y Gen. of U.S., 363 Fed.Appx. 898, 901 (3d Cir.2010) (“Specific intent requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing [the] specific and prohibited result.” (quoting Pierre v. Att’y Gen. of U.S., 528 F.3d 180, 189 (3d Cir.2008)) (internal quotation mark omitted in original)).
Notably, § 841(a)(1) is not a crime of general intent, but rather, of specific intent. See United States v. Pelletier, 666 F.3d 1, 11 (1st Cir.2011); Dyer, 589 F.3d at 534 (“[I]n the drug-trafficking context, we have consistently held that to prove possession with intent to distribute in violation of 21 U.S.C. § 841, the government must establish that the defendant knowingly and intentionally possessed a controlled substance with specific intent to distribute.”); García-Carrasquillo, 483 F.3d at 130.
Thus, the government shoulders the burden of establishing that the defendants here had the particular purpose of committing the unlawful act of narcotics distribution when in possession of the controlled substances. See Clark v. Arizona, 548 U.S. 735, 766, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006) (“[A] defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged, including the mental element or mens rea.” (internal citations omitted)). While there is evidence in the record to support the defendants’ possession of controlled substances, no evidence supports the finding that their intent when receiving drugs from “the box” and planting them in their targets’ residences was for any other purpose than fabricating false cases.
It is well-accepted that specific intent— an intangible concept — may be established by either direct or circumstantial evidence. See United States v. Cannon, 589 F.3d 514, 517 (1st Cir.2009); United States v. DesMarais, 938 F.2d 347, 352 (1st Cir. 1991) (“Seldom can ‘specific intent’ be established by direct evidence .... [but it may] [nevertheless ... be demonstrated ‘through the use of circumstantial evidence so long as the total evidence, including reasonable inferences, is sufficient to warrant a jury to conclude that the defendant is guilty beyond a reasonable doubt.’” (quoting United States v. Campa, 679 F.2d 1006, 1010 (1st Cir.1982))). Given the challenges presented in proving an individual’s subjective mental state, both this court and our sister courts have recognized that a specific intent to distribute controlled substances may be inferred from various factors. These factors include, among others, (1) the quantity of drugs in a defen *36 dant’s possession,[37] (2) the purity of the drugs at issue,[38] (3) the quantity of cash on a defendant,[39] (4) the manner in which the drugs were packaged,[40] (5) the presence of drug paraphernalia,[41] (6) the lack of any evidence showing a defendant used or consumed the type of drug seized,[42] (7) the presence of firearms,[43] (8) a defendant’s history of participation in drug distribution,[44] or (9) a combination of the above[45] Notably, such precedent for establishing a specific intent to distribute involves factors not present here.[46] Although such cases and their corresponding principles remain relevant for purposes of our analysis, none fall into the more narrow factual scope of our case: police officers planting drugs in order to frame their marks and generate grounds justifying an arrest.
Here the evidence before the jury for purposes of proving an intent to distribute on the part of the defendants included witness testimony and audio and video recordings showing that defendants received controlled substances, brought them to targets’ homes to plant them (thereby framing the victims and providing grounds for arrest), and almost immediately thereafter, seized the drugs and returned them to their place of storage so that the vicious conspiratorial cycle of false inculpation could repeat itself. Described more suc *37 cinetly, the evidence from which the government asked the jury to infer a specific intent to distribute was the officers’ actual acts of physically moving controlled substances amongst themselves to perform and complete the act of planting. Accepting arguendo that the officers’ physical acts here of planting evidence constitute drug distribution, the only evidence from which the jury could infer an intent to distribute was from the alleged act of distribution itself. I believe such a conclusion in this case presents a two-fold problem.
First, where specific intent is a distinct element of a crime (as here), such element must be proved separately from the actual commission of the crime itself. See, e.g., Morissette, 342 U.S. at 276, 72 S.Ct. 240 (noting that evidence showing defendant actually took property weighed towards whether defendant “consciously] and intentionally]” committed the crime; “[b]ut that isolated fact is not an adequate basis on which the jury should find the criminal intent to steal or knowingly convert.... [w]hether that intent existed, the jury must determine, not only from the act of taking, but from that together with defendant’s testimony and all of the surrounding circumstances”); United States v. Miles, 360 F.3d 472, 477 (5th Cir.2004) (“[S]trict adherence to the specific intent requirement contained in the text of the ... statute is important to ensure that only ‘conduct that is really distinct from the underlying specified unlawful activity is punished under th[e] provision.” (quoting United States v. Brown, 186 F.3d 661, 670 (5th Cir.1999))); United States ex rel. Vraniak v. Randolph, 261 F.2d 234, 237 (7th Cir.1958) (where specific intent is an element of a crime, “the specific intent must be proved as an independent fact and cannot be presumed from the commission of the unlawful act”). Thus, even if the officers’ case fabrication actions constituted drug distribution as such, the government cannot rest upon this evidence alone to confirm whether the officers held the requisite statutory intent to distribute. Such evidence, while unquestionably relevant, still must be considered in light of the surrounding circumstances.
And secondly, the “surrounding circumstances” of this case consist of the highly disturbing practice of police officers fabricating cases by planting evidence. The officers’ constant and unchanging intent— including while driving to the targets’ residences, entering their homes, and placing the controlled substances in a location for subsequent seizure — was to create an illusion of law enforcement, that is, catching their victims in a seemingly illegal act, and using the illusion as a justification for an unlawful arrest. The controlled substances here were simply the officers’ instrument of choice that they played to their victims’ downfall.
The reality is that the officers could have selected from a variety of instruments — swapping narcotics for firearms, ammunition rounds, or even endangered animals — and still have held the same intent (fabricating a case against a target and creating grounds for their arrest) while performing the same physical acts of driving to a home, temporarily depositing their instrument-of-choice in a location, and subsequently retrieving it. I find this to be a noteworthy point.
In reviewing other precedent in which an intent to distribute has been inferred from varying factors such as drug quantity, drug purity, or presence of drug paraphernalia, a switching of drugs with another item would have changed the question of intent entirely. And yet here, if the officers could have executed the same acts with different objects (ie., not controlled substances) and still satisfied the same intent and achieved the same overall objec *38 tive, I must ask: how can the officers have held the requisite intent to distribute controlled substances, if without such substances, their intent would have remained the same?
For the officers here to have held an intent to distribute, the court (as it has) would have to accept that an intent to physically pass, move, or pick-up a controlled substance is all that is needed to be shown to establish an intent to distribute under the 1970 Act. But this, in effect, emasculates the specific intent requirement of § 841(a)(1) such that the crime is degraded to one requiring only a general intent, an unacceptable result under established law. Were § 841(a)(1) the latter, then an intent to perform the actus reus of a crime would suffice for liability to attach. But as we have noted, the crime of possession with intent to distribute is one of specific intent requiring a specific mens rea. See Pelletier; 666 F.3d at 10; see also Latham, 874 F.2d at 863 (concluding district court’s jury instruction erroneously “permitted a finding of guilt if the defendant had a general intent to distribute cocaine” and noting that “essential elements” of the crime of possession with intent to distribute cocaine included possession, “either actually or constructively, ... with a specific intent to distribute”).
Having carefully considered the plain language of the statute, I fail to understand the majority’s conclusion, the upshot of which dilutes a specific intent crime’s mental state requirement to nothing more than a general intent showing. I thus turn to the Act itself for guidance. Though this court generally has recognized that “[t]he words of the statute are the first guide to any interpretation of the meaning of the statute ... if the meaning is plain,” we also have noted that this “maxim has inherent flexibility,” as “[ejven seemingly straightforward text should be informed by the purpose and context of the statute.” Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st Cir.1999). The fact that the defendants’ objective actions, when broken down to their most basic linguistic descriptive form, may be described as a “delivery” or “transfer” of drugs does not, for me, resolve the question of whether the officers held the requisite statutory intent to distribute such substances.
As the Supreme Court has recently noted, ceasing our statutory examination at a literal-reading-only point in the analytical roadway “would ignore the rule that, because statutes are not read as a collection of isolated phrases, ‘[a] word in a statute may or may not extend to the outer limits of its definitional possibilities.’ ” Abuelhawa v. United States, 556 U.S. 816, 819-20, 129 S.Ct. 2102, 173 L.Ed.2d 982 (2009) (alteration in original) (quoting Dolan v. U.S. Postal Serv., 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006)); U.S. Nat’l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (“Over and over we have stressed that ‘[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.’ ” (alteration in original) (quoting United States v. Heirs of Boisdore, 49 U.S. 113, 122, 8 How. 113, 12 L.Ed. 1009 (1849))). Thus, ever mindful that “[ijnterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis,” Dolan, 546 U.S. at 486, 126 S.Ct. 1252, I shift back into drive from my plain language stop and proceed onward down the statutory language analysis highway to determine whether an intent to fabricate cases equates to an intent to distribute.
*39 B. Statutory Purpose
Section 841 is contained in Chapter 13 (Drug Abuse Prevention and Control) of Title 21 (Food and Drugs) of the 1970 Controlled Substances Act. Before exploring the legislative history (which we typically turn to for purposes of understanding a statute’s meaning), I turn to the historical context surrounding enactment of the Controlled Substances Act. See generally Branch v. Smith, 538 U.S. 254, 266-71, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003) (considering historical context surrounding passage of the Voting Rights Act); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 589-615, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (reviewing the same in assessing the legislative history of three congressional acts and their effect on the boundaries of the Rosebud Reservation in South Dakota). This is a highly relevant backdrop to assessing Congress’s intent in passage of the Act, as a large number of drug laws already were present on the legislative books preceding its enactment, raising the question as to why Congress needed to create the Act, what void in the then-existing drug laws the Act was intended to fill, and how it was different from other provisions Congress previously had relied upon to target the ever-growing drug menace.
1. Historical Context
The Controlled Substances Act was the product of a decades-long battle of trying to curb the ever-rising tide of drug abuse and drug trafficking in the United States. The Act, however, was not Congress’s first swing at bat in attempting to combat the growing drug market. Congress’s efforts to erect legislative walls to control the flow of narcotics both into and within the United States, and to counter the social problems associated with drug abuse and addiction, date as far back as the nineteenth century.[47] A review of those laws predating the Act reveals a plethora of legislation with two predominant targeting themes: (1) drug abuse and (2) drug trafficking
The turn of the century brought with it the rising popularity of patent medicines used to treat common ailments. These medicines, however, contained addictive ingredients (e.g., opium, morphine, and cocaine) and contributed to a growing population of addicts. To combat these sources of addiction, Congress enacted legislation, the Pure Food and Drugs Act of 1906, that required labeling of medicines and prohibited the manufacture or shipment of misbranded or adulterated drugs in interstate commerce.[48] The goal was to discourage consumption via public exposure of such medications’ addictive and dangerous ingredients.
Subsequent years showed Congress taking more forceful steps to restrict and contain the flow of narcotics, whether into, *40 out of, or within the United States,[49] and more narrowly target the problems of drug abuse and drug addiction,[50] all while adjusting its means of drug enforcement, shifting powers from the Department of Treasury and the Department of Health, Education, and Welfare, ultimately into the hands of the Department of Justice.[51]
*41 Although Congress enacted various laws to target both drug trafficking and drug abuse throughout the early to mid-twentieth century, the main drug control law before Congress’s passage of the Controlled Substances Act was the Harrison Narcotics Act of 1914, ch. 1, 38 Stat. 785 (repealed 1970). The Act signified the government’s firm interjection of itself into the darker realm of narcotics trafficking in the United States, implanting methods of federal control and regulation that endured until the 1970 consolidation of the drug laws.
The Harrison Act served two principal purposes: (1) it created a federal watchdog system whereby the trafficking in narcotics was surveilled from the drugs’ date of entry or manufacture until their time of consumption, and (2) it established criminal penalties for drug trafficking that occurred outside legally authorized entities, persons, or chains. See generally 38 Stat. 785; United States v. Doremus, 249 U.S. 86, 90-95, 39 S.Ct. 214, 63 L.Ed. 493 (1919) (discussing Harrison Act’s regulation of drugs and upholding the Act on grounds that it did not exceed Congress’s tax powers). The Harrison Act thus affirmatively placed a fork in the drug marketing road— which has remained firmly planted ever since — dividing the flow of narcotics between two distinct paths, the high (legal) road, and the low (illegal) road. The Harrison Act directed such narcotic traffic by requiring manufacturers, producers, dispensers, distributors, and purchasers of drugs to both register with the government and to pay a special occupational tax. See Quinn & McLaughlin, at 593; see also Raich, 545 U.S. at 10-11, 125 S.Ct. 2195. Any type of sale, transfer, or exchange of drugs could only occur following a written order — limited to execution on documents specifically provided by the Commissioner of Internal Revenue — made by the person receiving such drugs. See Quinn & McLaughlin, at 593-94. Lastly, strict record-keeping requirements were imposed on anyone involved in the drug distribution system, allowing Congress to maintain a vigilant eye over both the drugs themselves and their corresponding transferors and recipients.
Notably, the Harrison Act’s efforts to target the illicit drug market — by casting light on all types of transfers and participants in the drug distribution system — had the unfortunate effect of pushing illegitimate transactions further into the shadowy realms beyond the reach of the law, with black market transactions thriving, like mushrooms, in the darkness.[52] After a patchwork of laws directed at targeting drug trafficking and drug abuse, the narcotics theme took full and center govern *42 mental stage with President Nixon’s assumption of the presidency in 1969.
President Nixon’s famous declaration of a “war on drugs” led to a complete transformation of the drug policy playing field.[53] Congress sought to create legislation “that would consolidate various drag laws on the books into a comprehensive statute, provide meaningful regulation over legitimate sources of drags to prevent diversion into illegal channels, and strengthen law enforcement tools against the traffic in illicit drugs.” Raich, 545 U.S. at 10, 125 S.Ct. 2195; see also id. at 12 (“[Pjrompted by a perceived need to consolidate the growing number of piecemeal drug laws and to enhance federal drag enforcement powers, Congress enacted the [Controlled Substances Act]”). And so the historical marathon of legislation came to a rest and the Comprehensive Drug Abuse Prevention and Control Act of 1970 came into being, consisting of three titles: Title I, addressing the prevention and treatment of narcotic addicts; Title II (most relevant for purposes of this appeal), addressing drug control and enforcement; and Title III, addressing the import and export of controlled substances. 84 Stat. 1238, 1242, 1285.
2. Legislative History
The legislative history of the Controlled Substances Act reveals that Congress transferred its same twofold intent as had existed in prior legislation, namely, targeting drug abuse and drug trafficking, into its passage of the 1970 Act. The Report of the Senate Judiciary Committee on the Controlled Substances Act of 1969 states that “[t]he control of drug abuse and of both the legitimate and illegitimate traffic in drugs is the main objective of the bill.” S.Rep. No. 91-613, at 4 (1969) (emphasis added). The House Committee Report on the bill similarly notes that the Act was intended to unite in a single statute the prior “plethora of legislation” targeting drug offenses, bringing together the “more than 50 pieces of legislation” that previously had targeted the twin evils of drug abuse and drag traffic and that had led to “a confusing and often duplicative approach to control of the legitimate industry and to enforcement against the illicit drag traffic.” H.R.Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566 at 4571 (1970).[54] Additionally, the House Committee Report breaks the soon-to-be Act into three provisions, Title I (focusing on drag abuse), and Titles II and III (focusing on drug trafficking), the division of which further reaffirms Congress’s twofold objective.[55]
*43 Exploration into the legislative history additionally reveals the following regarding Congress’s intent in passing the Controlled Substances Act.
a. Drug Abuse
The legislative history confirms that Congress intended to maintain its focus on drug abuse. Specifically, Congress sought to define those drugs of interest, focusing on their “abuse potential, and psychological and physical effects,” using such categorizations as a basis for creating penalties that corresponded with the severity of a substance’s abuse potential. H.R.Rep. No. 91-1444, at 4571; 4575-77; 4599-605; see also Touby v. United States, 500 U.S. 160, 162, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (“Violations involving schedule I substances carry the most severe penalties, as these substances are believed to pose the most serious threat to public safety.”); United States v. Moore, 423 U.S. 122, 132, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975) (noting that “[i]n enacting the CSA Congress attempted to devise a more flexible penalty structure than that used in the Harrison Act,” with penalties “geared to the nature of the violation, including the character of the drug involved”); see also Gonzales v. Oregon, 546 U.S. 243, 273-74, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). Congress’s consideration of the physical and mental effects substances could have on an individual required it to acknowledge those drugs capable of inciting dependency and awakening new addict populations, the latter of which could further foster incidents of drug trafficking. H.R.Rep. No. 91-1444, at 4573-74; 4592-95; 4599-605. Congress’s review of various substances’ addictive natures for purposes of categorization, determination of corresponding penalties based on their “abuse potential,” and concern with recurring drug abuse’s effects on the individual, further reaffirm Congress’s intent to target drug abuse under the Act, with drug abuse being equated with drug addiction. See Oregon, 546 U.S. at 273, 126 S.Ct. 904 (noting the Controlled Substances Act “consistently connect[s] the undefined term ‘drug abuse’ with addiction or abnormal effects on the nervous system”).
b. Drug Trafficking
The legislative history also confirms Congress’s directed aim at drug trafficking, both legitimate and illegitimate. See Moore, 423 U.S. at 134-35, 96 S.Ct. 335 (“The legislative history [of the Controlled Substances Act] indicates that Congress was concerned with the nature of the drug transaction .... [and] with the diversion of drugs from legitimate channels to illegitimate channels.”). For instance, the House Committee Report states the Act’s goal of “reducing] the availability of drugs subject to abuse except through legitimate channels of trade and for legitimate uses”. H.R.Rep. No. 91-1444, at 1970 U.S.C.C.A.N. 4566 at 4574; see also id. at 4569 (same); id. at 4571-72 (same); id. at 4589 (same); id. at 4590 (acknowledging that “law relating to the regulation of narcotics provides a closed system” of such drugs, making it “possible to keep diversions of narcotic drugs from legitimate channels of trade to an almost irreducible minimum”); id. at 4607 (noting the importance of maintaining “effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels”).
Additionally, the Senate Judiciary Committee Report on the Controlled Sub *44 stances Act of 1969, containing parallel provisions to those ultimately included in the 1970 Act, echoed that bill’s aim at “both the legitimate and illegitimate traffic in drugs,” S.Rep. No. 91-613, at 4, its section 502 as providing “additional penalties ... for those involved in the legitimate drug trade for illegal” trafficking, and its section 503 as applying “[fjurther penalties ... for registrants for illegal distribution,” id. at 9. The Senate’s Report further posits that “[ajpprehension of the serious traffickers and illicit manufacturers of drugs is probably the most effective way to control the drug problem.” Id. at 10. This language from both reports confirms Congress’s goal of distinguishing between legitimate versus illegitimate drug trafficking, and, via its legislative arm, creating channels with which to divert the movement of drugs away from illegitimate streams and into legitimate waters.
Regarding the Act’s aim at drug trafficking, we also observe these points. First, the legislative history repeatedly distinguishes between legitimate versus illegitimate forms of trafficking. See, e.g., H.R.Rep. No. 91-1444, at 4569 (distinguishing between members of the “legitimate distribution chain” and those “outside the legitimate distribution chain”); id. at 4571 (distinguishing between “the legitimate industry” and “enforcement against the illicit drug traffic”); id. at 4572 (same); id. at 4574 (describing a reduction in drug availability subject to abuse “except through legitimate channels of trade and for legitimate uses”); id. at 4584 (same); id. at 4589 (same); id. at 4590 (same); id. at 4601-02 (same); id. at 4606-07 (same).
Second, the legislative history indicates that legitimate “channels” or “markets” or “distribution chains” generally are determined by whether or not the participants are registered or authorized manufacturers, wholesalers, retailers, or users of narcotics, i.e., market participants; if they are not, then they fall outside the legitimate realm and into the “illicit market” category. See H.R. Rep. 91-1444, at 4569 (stating the bill requires “registration of manufacturers, wholesalers, retailers, and all others in the legitimate distribution chain, and makes transactions outside the legitimate distribution chain illegal”); id. at 4589 (same); id. at 4602 (same); id. at 4605-06 (same); S.Rep. No. 91-613, at 6 (same).
Third, Congress’s imposed registration requirements serve not only to verify whether a participant is involved in the legitimate or illicit drug market, but also, to ensure Congress’s watchful gaze over each controlled substance and its respective movements to try and further curtail drug abuse and its associated problems. See H.R.Rep. No. 91-1444, at 4569 (noting registration of manufacturers, wholesalers, retailers, and others in legitimate distribution chain meant to ensure “control by the Justice Department of problems related to drug abuse”).
Fourth, legislative history links participation in drug distribution with participation in the drug market or drug industry. Specifically, the legislative history indicates that Congress sought to create a “closed system” of drug manufacturing, distribution, and dispensing that (ideally) would lead to a diminishment — if not extinction — of the illicit drug market. See H.R.Rep. No. 91-1444, at 4571-72 (“The bill is designed to improve the administration and regulation of the manufacturing, distribution, and dispensing of controlled substances by providing a ‘closed’ system of drug distribution for legitimate handlers of such drugs” that would “significantly reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time *45 providing [for a] legitimate drug industry. ...”); see also id. at 4574.
Similarly, Congress connects the flow of controlled substances with its effect on commerce, again effectively linking drug distribution with the drug market. See H.R.Rep. No. 91-1444, at 4596 (“Controlled substances either flow through interstate or foreign commerce or they have a substantial and direct effect upon interstate commerce....”); id. (“Those substances manufactured or distributed on a purely intrastate basis cannot be differentiated from those manufactured or distributed for interstate commerce.... ”).
In sum, the legislative history on trafficking reveals that Congress intended to target both legitimate and illegitimate drug trafficking; legitimate trafficking correlates with drug movement through legitimate “channels” or “distribution chains;” the key players in a “legitimate channel” or “legitimate distribution chain” consist of registered manufacturers, wholesalers, retailers and the like; registration serves the dual purpose of enabling effective monitoring of all legitimate drug transfers and further curbing incidents of drug abuse through careful surveillance; Congress connects drug distribution, whether via registered or unregistered entities, with participation in the drug market, whether licit or illicit; and it lastly links any such participation in the drug market with a potential for drug abuse and its corresponding problems.
It is thus beyond cavil that the object and intent of the Controlled Substances Act was the control of drug abuse and drug trafficking. With this legislative framework in mind, I return to the facts of our case.
C. Back to the Facts
The evidence adduced at trial revealed that the officers’ intent at all times while handling the controlled substances was to fabricate a case against a given mark. Specifically, the evidence (consisting of testimony from cooperating witnesses and audio and video recordings) showed that all controlled substances were kept in the care and custody of Santiago. Santiago only accessed the box, or allowed others to so access the box, when officers were planning to execute a search warrant or perform another form of police intervention potentially leading to arrest. Officers who received the controlled substances did so with specific instructions to make any search or intervention turn out “positive” through the use of planted drugs. The officers only use of the drugs consisted of going to a location in which the target was located, planting the evidence, and using it as grounds for a seemingly lawful arrest. All drugs were then immediately returned to the black box, to a co-conspirator’s control, or, if there was more than one search or intervention in a given day, used again in the same manner to falsify grounds for a mark’s arrest.
Thus, taken together, the evidence shows that the one sole, consistent purpose motivating the officers’ actions and collective scheme was to falsify cases against certain targets by means of planting evidence, with controlled substances serving as their weapon of choice, and to retrieve and store the drugs once they no longer were being used for such falsification purposes.[56] Their intent was never to con *46 sume (or try and make others consume) the narcotics or use the drugs in a way that raised a potential for addiction (ie., drug abuse), nor was their objective to introduce or circulate the drugs into society’s illicit drug market channels (ie., drug trafficking).[57]
Courts, including ours, have consistently recognized Congress’s intent to broadly target ever-evolving forms of drug transactions through enactment of the Controlled Substances Act and its coinciding provisions.[58] Moreover, the legislative history makes clear that Congress’s goal in enacting the Controlled Substances Act was to target drug abuse and drug trafficking, and that §§ 841(a)(1) and 846 were two such widely-sweeping provisions through which Congress intended to prevent, or at least control, either of such double troubles from happening or increasing in occurrence. However, the fact that Congress intends a law to apply broadly does not mean that it or its corresponding provisions are limitless in application.
It is axiomatic that the law presumes men intend the natural consequences of *47 their actions, but this presumption fails where the evidentiary mirror reflects an intent different from that required under the statute. Pico v. United States, 228 U.S. 125, 231, 33 S.Ct. 482, 57 L.Ed. 812 (1913); McDonald v. United States, 9 F.2d 506, 508 (8th Cir.1925) (“While it is a fundamental rule that men are presumed to intend the natural consequences of their acts, yet this presumption cannot prevail in the presence of positive proof of a specific intent different from that required by the statute.”). In such instances, “it devolves upon the government to present affirmative evidence of the existence of the required unlawful intent” essential to the crime charged. McDonald, 9 F.2d at 508.
In my view, the government’s evidence falls short of the requisite specific intent mark for us to affirm appellants’ convictions for violating 21 U.S.C. §§ 841 and 846. See United States v. Feola, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (“[T]o sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself.”); Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). The officers’ specific intent under the facts of this case does not equate with the dual objects which Congress has historically pursued in its controlled substances legislation and on which it set its legislative eyes in the passage of the 1970 Act and the corresponding provisions of §§ 841(a)(1) and 846: drug abuse and drug trafficking.[59] See Oregon, 546 U.S. at 268, 126 S.Ct. 904 (referring to the Controlled Substances Act’s “statutory purposes to combat drug abuse and prevent illicit drug trafficking ” (emphasis added)); Raich, 545 U.S. at 12, 125 S.Ct. 2195 (stating “[t]he main objectives of the [Controlled Substances Act] were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances ”) (emphasis added); United States v. Pumphrey, 831 F.2d 307, 309 n. 3 (D.C.Cir.1987).
III.
After a thorough search, I have been unable to find any decision, reported or otherwise, in which an individual has been charged or convicted for violation of the statutes as charged under count two, nor has the majority (or the parties, for that matter) pointed to any such decision or precedent.[60] The absence of any precedent since the Controlled Substances Act’s enactment in which a person has been charged (much less convicted) for possession of controlled substances with an intent *48 to distribute — where the only proffered evidence was the individual’s planting of drugs with the specific purpose to frame others — I find to be highly compelling. Though the majority brushes this lack-of-precedent contention aside on grounds of prosecutorial discretion and claiming that a scarcity of precedent “says nothing about the incidence rate of similar misconduct ... and nothing about whether similar prosecutions were brought but did not result in reported decisions,” Maj. Op. at 22, I respectfully take issue with its more cavalier response to what I believe is a relevant point.[61]
To begin with, I flag this concern not because I believe it may reasonably be contended that the underlying acts of planting at issue here never have taken place before, nor because I believe we hold the power to invalidate a conviction solely on the basis of whether a track record of such prosecutions in the past exists. See Maj. Op. at 22. As to the former point, though one would hope such incidents are few and far between, I am not so naive as to think that past police misconduct has never encapsulated such condemnable acts. And to the latter, I raise this lack-of-precedent point solely to reinforce my contention that the distribution statutes at issue — 21 U.S.C. §§ 841(a)(1) & 846 — are not the appropriate tools with which to tackle the opprobrious charges underlying count two (ie., that possessing drugs with an intent to fabricate cases against targets is equivalent to possessing drugs with the specific intent to engage in drug distribution). Notably, the acts of case fabrication at issue, clear violations of individuals’ civil rights, are not without remedy — they unquestionably fall, as evidenced supra, within the ambit of other statutes enacted by Congress, with 18 U.S.C. § 241 serving as one of the weapons it more commonly uses to target such acts of civil rights infringement.[62]
Moreover, I find it quite telling that the government deemed this dearth of supporting precedent a relevant factor when deciding which charges it properly could bring in this case. Specifically, the government at oral argument explained that, when initially preparing the indictment in this case, “the Department” (which I presume to mean the Department of Justice) sent out an agency-wide email requesting the respective views of all other “offices” (which I assume refers to all other U.S. Attorney offices), as to whether the officers in this ease could be charged with possession with intent to distribute for their underlying acts of police misconduct. The government conceded that its broad conferral revealed no consensus whatsoever from the Department as to whether such acts fell within the ambit of 21 U.S.C. § 841(a)(1). Nevertheless, despite this lack of consensus, the Puerto Rico office decided to proceed.
At the very least, the fact that no other judgment has been issued sustaining the government’s novel interpretation of an in *49 tent to distribute as including an intent to falsify cases through planting evidence supports my concern that such a reading does not fall within Congress’s intended purview of § 841’s possession-with-intent-to-distribute proscription. Indeed, it borders on the preposterous to conclude that out of ninety-three U.S. Attorney Offices in the United States, only the Puerto Rico office has not been derelict in charging under the law in question, and that the remaining offices have apparently been blind to what the majority believes was a clear proscription of the law since its 1970 enactment. Tragic a statement as it may be, the District of Puerto Rico is not the only jurisdiction in which rogue police officers exist. This is a regrettable, unfortunate fact of which we could almost take judicial notice. But charging under a statute for conduct of which no prior precedent exists may, in some instances, be a form of rogueness which this court should not sanction; indeed, such potential overreaching raises constitutional red flags that I fear may fly in future cases before this court.[63]
IV.
To be clear, any abuse of the authoritative badge is reprehensible and an indignity to the very laws the badge is charged with upholding. But I simply cannot accept the government’s — and now majority’s — novel position that an intent to fabricate cases and falsify arrests is tantamount to an intent to commit drug distribution. Although I do not question prosecutors’ accepted discretion to pick and choose among those statutes it deems most applicable to the crimes and charges at issue, such power is not absolute, particularly where the evidence does not support the crime charged. This is such a case. I thus would reverse the convictions of appellants Santiago, Cortés, and Dominguez under count two and remand their cases for resentencing based only on the count one conviction. For this reason, I likewise dissent to Parts II.C.l and II.C.2 of the opinion.

. The government’s evidence in support of its count one and count two convictions is the same. That is, the government points to no distinguishing evidence from that presented in its count one case in support of the count two convictions, nor does the record reveal any such additional evidence.

. The majority also cites to Santistevan to support its contention that I confuse the officers’ specific intent with their overall motive in performing the contested acts of planting. See Maj. Op. at 19-20, 23-24 (citing Santistevan, 39 F.3d at 255 n. 7). Notably, Santistevan only concerns the general intent crime of distribution, not the specific intent crime at issue here. Moreover, the cited footnote's discussion addresses the relevance of a defendant’s motive when assessing whether a defendant engaged in the act of distribution. As I repeatedly emphasize, our focus in this case should be on the specific intent required for the crime of possession with intent to distribute, not on the general intent requisites of the crime of drug distribution.

. United States v. Cormier, 468 F.3d 63, 71 (1st Cir.2006); United States v. Rivera-Ruíz, 244 F.3d 263, 269 (1st Cir.2001); United States v. Latham, 874 F.2d 852, 862-63 (1st Cir. 1989) (collecting cases supporting the notion that "possession of large quantities of drugs justifies the inference that the drugs are for distribution”).

. United States v. Echeverri, 982 F.2d 675, 678 (1st Cir.1993).

. United States v. Ayala-García, 574 F.3d 5, 13 (1st Cir.2009); United States v. Mangual-Santiago, 562 F.3d 411, 425 (1st Cir.2009).

. Ayala-Garcia, 574 F.3d at 13 (finding that "the packaging alone,” consisting of ninety plastic cylinders of cocaine, forty-four plastic bags of cocaine, and fifty-six aluminum wrappings of heroin, "was strong circumstantial evidence that the drugs were intended for distribution”); Garcia-Carrasquillo, 483 F.3d at 130 n. 12.

. United States v. García, 983 F.2d 1160, 1165 (1st Cir.1993); DesMarais, 938 F.2d at 352 (noting that "[a] reasonable inference of specific intent to distribute” was supported "by the presence of drug paraphernalia, including a triple beam scale, plastic baggies, and magazines with current marijuana prices”); United States v. Butler, 763 F.2d 11, 15 (1st Cir. 1985).

. See United States v. Andrade, 94 F.3d 9, 13 (1st Cir.1996) (noting fact that defendant did not have any "implements” with which to smoke crack as factor supporting inference of intent to distribute).

. Cannon, 589 F.3d at 518; United States v. Rivera-Calderón, 578 F.3d 78, 94 (1st Cir. 2009).

. United States v. Landrau-López, 444 F.3d 19, 24 (1st Cir.2006) (citing cases); United States v. Arias-Montoya, 967 F.2d 708, 712-13 & n. 7 (1st Cir.1992) (noting evidence of "continuous dealing” as relevant in assessing a defendant’s intent regarding distribution); see also United States v. LePage, 477 F.3d 485, 489 (7th Cir.2007).

. United States v. Shurn, 849 F.2d 1090, 1093 (8th Cir.1988) ("The intent to distribute may be proven by either direct or circumstantial evidence and may be inferred from such things as the possession of a large quantity of a controlled substance, its high purity level, the presence of paraphernalia used to aid in the distribution of drugs, large sums of unexplained cash, and the presence of firearms.”).

. The sole exception to this is that appellants here, as police officers, likely were equipped with firearms as they carried out their case fabrication schemes. However, their being armed correlated to their capacity as police officers and not to a specific intent to further drug abuse or drug trafficking. See, e.g., Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1148 (10th Cir.2011) ("Police officers carry guns....”).

. In 1842, Congress placed opium on its tariff lists, viewing the narcotic as a source of government revenue. See Tariff of 1842 (“Black Tariff"), Act of Aug. 30, 1842, ch. 270, 5 stat. 548, 558; see also Thomas M. Quinn & Gerald T. McLaughlin, The Evolution of Federal Drug Control Legislation, 22 Cath. U.L.Rev. 586-90 (1972-1973) (hereinafter “Quinn & McLaughlin”). As opium smoking began infiltrating varying levels of society, new revenue brought with it new problems of drug abuse and addiction. Congress accordingly began tightening the means of general accessibility to the drug, placing high taxes on all imported smoking opium. Quinn & McLaughlin, at 590 (citing Act of July 12, 1862, ch. 163, 12 stat. 543, 548).

. Pure Food and Drugs Act of 1906, ch. 3915, 34 Stat. 768, repealed by Act of June 25, 1938, ch. 675, 52 Stat. 1059; see also Quinn & McLaughlin, at 590-91.

. Between 1909 and 1914, the federal government banned the importation and exportation of smoking opium, see Opium Exclusion Act, Pub.L. No. 60-221, 35 Stat. 614 (1909), severely restricted the import of other forms of opium, see Narcotics Drugs Import and Export Act of 1914, Pub.L. No. 63-230, 38 Stat. 275 (repealed 1970), and heavily taxed opium’s domestic production, see Harrison Narcotics Tax Act, ch. 1, 38 Stat. 785 (1914).
In 1922, Congress passed the Narcotic Drug Import and Export Act, Pub.L. No. 67-227, 42 Stat. 596 (1922), adding cocaine to the list of drugs banned from entry into the country.
In 1937, Congress passed the Marihuana Tax Act, which required participants in the marijuana distribution chain to register with the government and to pay a tax, both increasing federal control over the drug and creating at least a monetary deterrence for those seeking its purchase. Pub.L. No. 238, 50 Stat. 551 (repealed 1970); see also Gonzales v. Raich, 545 U.S. 1, 11, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). Also in the 1930s, Congress continued to tighten its controls over the increasing black market in illegal drugs, passing both the Informers Act, ch. 829, 46 Stat. 850 (1930) (authorizing payment of informers for violations of drugs laws), and the Vehicle Seizure Act, ch. 618, 53 Stat. 1291 (1939) (prohibiting the transport of narcotics in or by means of a vessel, vehicle, or aircraft).
Congress continued to break new ground in drug control in the 1960s. Although it previously had focused on the flow of narcotics into the general public by targeting U.S. ports, in 1960 Congress enacted the Narcotic Manufacturing Act, Pub.L. No. 86-429, 74 Stat. 55 (1960) to control the quantities of narcotics actually manufactured within the United States.
Congress's last big move before enacting the Controlled Substances Act was its 1965 amendments to the 1906 Food, Drug and Cosmetic Act. See Drug Abuse Control Amendments of 1965, Pub.L. No. 89-74, 79 Stat. 226 (1965). These amendments expanded Congress’s narcotics regulation into the realm of "dangerous drugs” depressants, stimulants, and hallucinogens), targeting all forms of their illicit traffic and imposing various administrative requirements on those involved in the production, sale, or disposal of such drugs. See Quinn & McLaughlin, at 603-05.

. By the late 1920s, Congress faced an ever-increasing population of addicts and drug abusers. One such rising population was addicts in prison. To target the increasing numbers, Congress passed the Porter Act in 1929, ch. 82, 45 Stat. 1085 (1929), which created two treatment centers to provide rehabilitative care for convicted addicts. Quinn & McLaughlin, at 599.
Another population of concern was young people. Following a Special Senate Committee on Organized Crime's study on the rising number of young addicts during the years 1946 through 1951, Congress increased penalties for narcotics violations both in 1951, see Boggs Act of Nov. 2, 1956, ch. 666, 65 Stat. 767 (repealed 1970), and again in 1956, see Narcotics Control Act of 1956, Pub.L. No. 84-728, 70 Stat. 567 (repealed 1970). See Quinn & McLaughlin, at 601-02.
In the 1960s, Congress again revamped its approach to addicts and passed the Narcotic Addict Rehabilitation Act, Pub.L. No. 89-793, 80 Stat. 1438 (1966). The Act expanded rehabilitative treatment from imprisoned addicts to those who voluntarily sought treatment for their illness.

. The Department of Treasury originally served as the government’s main enforcer against the drug market, with Congress creating the Prohibition Bureau of the Department of Treasury in 1927. See Quinn & McLaughlin, at 599; see also Raich, 545 U.S. at 10, 125 S.Ct. 2195. In 1930, as enforcement needs grew, a separate agency was created, the Federal Bureau of Narcotics. See id.; see also Act of 1927, ch. 348, 44 Stat. 1381 (1927).
Congress’s focus in the 1960s on dangerous drugs caused the Food and Drug Administration ("FDA”) of the Department of Health, Education, and Welfare ("HEW”) to step in and create the Bureau of Drug Abuse Control. See Quinn & McLaughlin, at 605. By 1968, *41 jurisdiction over dangerous drugs officially was transferred from the FDA to the Department of Justice, see Reorganization Plan No. 1 of 1968, § 2(a), 28 U.S.C. § 509 (1970), signifying a merger of both the Department of Treasury’s Bureau of Narcotics and the HEW's Bureau of Drug Abuse Control.

. An effect of the Harrison Act that one commentator has noted is tied into section 2 of the Act, which exempted from coverage the dispensing or distribution of drugs "to a patient by a physician ... in the course of his professional practice," ch. 1, § 2(a), 38 Stat. 785, at 786 (1914). The upshot of the provision, however, was a wave of patient-addicts seeking “legal” administration of a drug from their doctor. See, e.g., United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922); Jin Fuey Moy v. United States, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214 (1920); Webb v. United States, 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497 (1919). As courts tightened up on those medical treatments they deemed to fall within the legal provisions of the Harrison Act, addicts, being increasingly forced out of doctors’ offices, sought a new supply in the black market. And so, “[t]he addict-patient vanished; the addict-criminal emerged in his place." Rufus King, The Drug Hang-Up: America's Fifty-Year Folly 43 (1974).

. See D. Musto & P. Korsmeyer, The Quest for Drug Control: Politics and Federal Policy in a Period of Increasing Substance Abuse (1963-1981) 60 (2002).

. The House Committee Report describes the Controlled Substances Act's purpose as:
to deal in a comprehensive fashion with the growing menace of drug abuse in the United States (1) through providing authority for increased efforts in drug abuse prevention and rehabilitation of users, (2) through providing more effective means for law enforcement aspects of drug abuse prevention and control, and (3) by providing for an overall balanced scheme of criminal penalties for offenses involving drugs.
H.R.Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566 at 4567 (emphasis added).

. Specifically, Title I focuses on the problem of drug abuse, i.e., drug addiction and forms of rehabilitation, treatment, and prevention. See H.R.Rep. No. 91-1444, at 4568-69 (describing Title I as "establish[ing] rehabilitation programs relating to drug abuse,” and increasing "efforts in the rehabilitation, treatment, and prevention of drug abuse”). Titles II and III aim at drug trafficking, both within and outside of the United States. See Raich, 545 U.S. at 12, 125 S.Ct. 2195 (stating Title II "repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs.”); see also H.R.Rep. No. 91-1444, *43 1970 U.S.C.C.A.N. 4566 at 4571 (noting Title III "provides for control of imports and exports of drugs subject to abuse ... with criminal penalties for transactions outside the legitimate chain'1).

. Even the government's framing of the officers’ intent in its indictment reveals the same purpose. In its "Object of the [Count Two] Conspiracy” section, the government states:
It was the object of the conspiracy to possess with the intent to distribute controlled substances in the fabrication of cases against individuals in the Commonwealth of Puerto Rico in order to further the object of *46 the conspiracy contained in Count One of this indictment.
(Emphasis added).
The government describes the object of the count one conspiracy as "[t]o plant illegal controlled substances on or near persons in the Commonwealth of Puerto Rico,” and "[t]o swear out false search warrant affidavits against persons in the Commonwealth of Puerto Rico,” both of which resulted in "the unreasonable seizures and unlawful detentions and arrests of these persons.”
In its charging of the "Manner and Means” the officers' used to effectuate the object of their count two conspiracy, the government provides:
The foregoing object of the [Count Two] conspiracy was to be accomplished as follows:
1. Defendants and other uncharged co-conspirators would use their status as sworn officers of the POPR Mayaguez Drug/Narcotics/Vice Unit to retain controlled substances seized at various times during the conspiracy in order to use these controlled substances to fabricate cases against individuals in the Commonwealth of Puerto Rico.
2. The defendants and other uncharged co-conspirators would share these controlled substances amongst themselves in order to assist each other in carrying out the objects of the conspiracy contained in Count One of this Indictment.
(Emphasis added).

. As to this last point, the only recipients of the drugs in the planting scheme were police officers; their victims never had any knowledge as to the drugs' presence on their property, and though the victims may have had questionable legal backgrounds, they still never consented or willingly participated in receipt of the controlled substances for which the officers arrested them. Contrary to the majority's insinuation, simply because the officers’ victims may have engaged in drug deals in the past does not mean that the officers” leaving of drugs on the targeted drug leaders or dealers’ properties constituted an insertion of drugs into an illicit channel at the particular time of planting. See Maj. Op. at 23 n. 26 ("The evidence is that the officers did intend to introduce the drugs into society's illicit channels.... Indeed, the evidence shows that the officers repeatedly transferred the drugs to known drug leaders and dealers, often leaving drugs somewhere on the drug dealer’s property so that the drugs would be 'discovered' by other officers.”). In fact, the drugs never left the control or authority of the police officers, who at the time of planting, already were in the process of searching a victim’s home, with their targets accordingly seized and under their authority during the execution of the search.

. See, e.g., United States v. Wallace, 532 F.3d 126, 129 (2d Cir.2008) (noting that the terms "distribute” and "deliver” reflect a congressional intent " ‘to proscribe a range of conduct broader than the mere sale of narcotics’ " (quoting United States v. Washington, 41 F.3d 917, 919 (4th Cir. 1994))); United States v. Tingle, 183 F.3d 719, 727 n. 3 (7th Cir. 1999) ("Courts usually interpret the term 'distribution' and related words quite broadly.”); United States v. Pruitt, 487 F.2d 1241, 1245 (8th Cir. 1973).

. The majority takes issue with my contention that Congress’s goal in enacting the Controlled Substances Act, and in particular, § 841(a)(1), was to target the double evils of drug abuse and drug trafficking. The majority itself, however, seems to concede the relevance of such factors in its discussion of why it claims I mistake overall objective for specific intent. Specifically, the majority discusses United States v. Boidi, 568 F.3d 24 (1st Cir. 2009). But the language cited by the majority to support its understanding of the term “distribute” and its corresponding intent — i.e., "[wjhether or not sharing [drugs] with a girlfriend is often so prosecuted, it is as much 'distribution' as selling it on a street corner,” Maj. Op. at 19 (quoting Boidi, 568 F.3d at 29) — still reflects what I believe were Congress’s twin goals in enacting the underlying statute and the focal points at which it intended to direct the statute's aim: drug abuse (the girlfriend’s consumption of the drugs) and drug trafficking (selling on the street corner).

. Those cases cited by the majority in footnote 25 as alleged support for the contrary conclusion do not persuade otherwise; rather, such cases concern classic acts of drug distribution (involving either drug abuse or drug trafficking), actions which the history of this legislation clearly prohibits.

. Though the majority finds this dearth of law an unpersuasive point, when challenging my contention (based on the Controlled Substances Act's legislative history) that a specific intent to distribute drugs should somehow trigger or implicate Congress's twin goals of targeting drug abuse or drug trafficking, the majority cites to a lack of precedent to support its position that such factors are not part of the analysis for assessing specific intent under § 841. Maj. Op. at 23.

. For this reason, I take no issue with the majority's point that officers lawfully engaged in drug distribution are shielded from liability pursuant to 21 U.S.C. § 885(d), but that those who unlawfully participate in such acts may have their cloaks of immunity pierced. See Maj. Op. at 19-21.

. The government’s novel proposal to interpret and enforce §§ 841(a)(1) and 846 in this radically new manner could prove constitutionally problematic. See U.S. Const. amend. XIV; Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (stating "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement”); see also Clark v. Martínez, 543 U.S. 371, 381-82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (canon of constitutional avoidance “is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts”).